IN THE UNITED STATES DISTRICT COURT,
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOUIS GLUNZ BEER, INC., | ) |
| Plaintiff, | ) Case No. 26-cv-1124 |
| v. | ) |
| | ) |
| CANVAS 340, LLC, | ) |
| Defendant. | ) |

## COMPLAINT

### Introduction

Plaintiff Louis Glunz Beer, Inc. ("Glunz") brings this action to end, and be made whole for, a scheme by Defendant Canvas 340, LLC ("Canvas") to terminate Glunz's exclusive distributorship for the WYNK beverage brand without fully remunerating Glunz for the value of that distributorship. After Glunz built the brand from minimal sales to a category leader in its territory, Canvas issued a notice to terminate without good cause and orchestrated a transition to new distributors in violation of its contractual and statutory obligations. This improper conduct included withholding retailer activations, diverting new accounts from Glunz for Canvas's own benefit, and tendering only a fraction of the contractually required fair-market value ("FMV") for Glunz's distribution rights. Additionally, Canvas accessed, used, and disclosed Glunz's confidential trade secrets—including its account-level sales data and retailer roadmap—to enable the new distributors to step into Glunz's position, in breach of the parties' Agreement (defined below) and in violation of the Defend Trade Secrets Act and the Illinois Trade Secrets Act. Glunz seeks all available contractual, statutory, and equitable relief, including but not limited to payment of the full FMV, damages for lost profits, and appropriate injunctive and declaratory relief.

### Parties

1. Plaintiff Louis Glunz Beer, Inc., is an Illinois corporation with its principal place of business at 7100 Capitol Drive, Lincolnwood, Illinois.

2. Defendant Canvas 340, LLC ("Canvas") is a United States Virgin Islands limited liability company with its principal office at East End Plaza, Suite 120, 6115 Smith Bay, Charlotte Amalie, United States Virgin Islands 00802.

3. Upon information and belief, its members include Shawn P. Sheehan and the Shawn P. Sheehan Revocable Trust, neither is a resident or citizen of Illinois.

4. Canvas regularly conducts business in this District, including through distribution of WYNK-branded products and retailer-facing activities.

**Jurisdiction and Venue**

5. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. The Court has supplemental jurisdiction over the related state-law claims asserted in this case under 28 U.S.C. § 1367(a).

6. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7. Personal jurisdiction is proper because Canvas transacted business and committed tortious and contractual acts in this District, purposefully directed relevant conduct at this forum, and consented to jurisdiction pursuant to the parties' agreement.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to the claims occurred here and because Glunz resides in this District and Canvas is subject to personal jurisdiction here.

9. Moreover, Canvas agreed and consented to litigation occurring in courts in Cook County, Illinois and to the exclusive jurisdiction and venue of the courts within Cook County.

**Factual Allegations**

10. Glunz is a family-owned and operated beverage distributor with over a century of experience serving the Chicagoland area. It is one of the most respected and well-established distributors of domestic, craft, and imported beers, as well as a growing portfolio of specialty beverages, including ciders, seltzers, and non-alcoholic products, in its territory.

11. Canvas produces and supplies WYNK-branded beverages, a line of alcohol-free seltzers containing hemp-derived cannabinoids. Canvas markets and sells these products nationwide through a network of distributors, including Glunz.

12. Prior to partnering with Glunz, Canvas had no distribution network, negligible sales, and no brand recognition for WYNK in Illinois. The WYNK brand and its hemp-derived beverage category were entirely new and unknown to retailers and consumers in the territory where Canvas sought to enter.

13. Canvas sought out Glunz specifically for its deep experience, strong retailer relationships, and proven ability to build new and niche brands in the competitive Chicagoland market.

14. Beginning in 2023, and Following discussion between Canvas and Glunz, Glunz agreed to launch the WYNK brand and invested substantial time, money, and resources to create a market for WYNK that did not previously exist. This included educating retailers and

consumers about an entirely new product category, securing initial placements, and generating the initial sales velocity and consumer demand from a standing start.

15. On or about October 20, 2023, Glunz and Canvas memorialized their relationship by entering into a written distribution agreement (the "Agreement") granting Glunz exclusive distribution rights for WYNK-branded products within a defined territory (the "Territory").

16. The Agreement is a written, exclusive distributorship that grants Glunz sole rights to distribute WYNK-branded products within a defined Illinois territory and sets the framework for the parties' performance, confidentiality, and termination procedures. It provides territorial exclusivity to Glunz and restricts Canvas from appointing or selling through any successor in the Territory absent compliance with express conditions precedent.

17. Absent "Good Cause," or certain limited "cause" events, the Agreement prohibits termination of Glunz's exclusive rights or appointment of a successor distributor unless and until Canvas first satisfies specified conditions precedent. Paragraph 5 of the Agreement states:

> 5. **Termination or Failure to Renew Without Good Cause.** Supplier may terminate or fail to renew this Agreement without Good Cause upon sixty (60) days prior notice. In the event that Supplier terminates or fails to renew, this Agreement without Good Cause, then within sixty (60) days of the notice of termination, Supplier shall pay Distributor an amount equal to the fair market value of Distributor's distribution rights which shall not be less than three (3) times Distributor's twelve (12) months trailing gross profit on the sale of the Products sold by Distributor in the Territory (the "Compensation"). If this option is exercised within twelve (12) months of the Effective Date, Supplier shall pay Distributor an amount equal to three (3) times Distributor's average monthly gross profit on the sale of the Products sold by Distributor in the Territory multiplied by twelve (12). Distributor agrees and acknowledges that notwithstanding any other provision of this Agreement, the Compensation was mutually agreed upon. The payment shall be in addition to any amounts payable for inventories under Section 4(e). Provided the Compensation is promptly paid in accordance with this subsection, Distributor agrees that: (i) the Compensation constitutes Distributor's sole compensation of any kind to which it is entitled for the termination of the Agreement by Supplier; and (ii) the Compensation represents full and fair compensation to Distributor for the termination of this Agreement and Distributor's loss of the distribution rights hereunder.

18. The Agreement further protects Glunz's confidential and trade secret information, including retailer contacts, sales levels, depletion amounts, retailer purchasing information, pricing ladders, promotion cadence, feature/reset calendars, and sales programs. It restricts use of such data to authorized purposes and prohibits disclosure to third parties absent consent or express permission. As stated in Paragraph 8(d) of the Agreement:

> (d) <u>Confidentiality</u>. Each party acknowledges and agrees that, during the Term and for period of one (1) year thereafter, the non-disclosing party shall (i) protect the Confidential Information (as such term is hereinafter defined) of the disclosing party with at least the same degree of care as the non-disclosing party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care, and (ii) not disclose, copy, download or use for the direct or indirect benefit of any third party any Confidential Information. The term "Confidential Information" shall mean trade secrets, product innovations, and business plans, sales reports, customer lists, depletion reports and other sales related data. Confidential Information shall not include information that (A) is or becomes part of the public domain through no act or omission attributable to the non-disclosing party; (B) is or becomes available to the non-disclosing party from an independent source without breach of any confidentiality obligations owed to the disclosing party; (C) was lawfully in possession of, developed by, or known by the non-disclosing party prior to receiving it from the disclosing party; (D) is released after prior written authorization by the disclosing Party; or (v) is required by law, to be disclosed; provided, however, that, if disclosure is required by law, the non-disclosing Party shall provide the disclosing Party with prompt notice of such requirement so that the disclosing Party may seek protection of the Confidential Information.

19. Glunz also provided Canvas with confidential information from Glunz's sales representatives and their specialized knowledge regarding the market and allowed Canvas representatives to work directly with Glunz sales representatives and obtain the proprietary and confidential information related to sales, ordering and account data and information.

20. All of this confidential information has independent economic value from not being generally known and not being readily ascertainable by proper means by others who could obtain economic value from their disclosure or use. In particular, because the datasets reveal—at a granular, account-specific level—which stores buy which SKUs, at what price points, on what cadence, with which features, and under which buyer preferences, they enable a competitor or successor distributor to: (a) target high-yield doors immediately; (b) undercut Glunz's negotiated price strategies with precision; and (c) time promotions and solicitations to leapfrog fixed planogram resets and feature windows, producing rapid, store-by-store displacement that cannot be recreated after the fact. The breadth, recency, and store-level curation of the VIP/SRS exports and dashboards make replication through proper means extraordinarily difficult and time-consuming; reconstructing weekly depletions, pricing histories, compliance notes, planogram placements, and buyer-preference insights across hundreds of accounts would require extensive cooperation and resources and would remain incomplete even with substantial effort. These competitive advantages exist precisely because Glunz's compilations are secret and non-public; Glunz does not publish the information, and it is not available from public sources in compiled, account-level form.

21. Glunz protects this information by among other measures, requiring written confidentiality agreements, restricting access on a need-to-know basis through role-based permissions, enforcing password authentication, labeling materials as confidential, issuing unique and limited supplier credentials for internal analytics, and implementing off-boarding and audit controls; the Agreement also defines sales reports, customer lists, depletion reports, and sales-related data as confidential.

22. In addition to the data Glunz shared with Canvas, Canvas obtained credentialed access to Glunz's account-level retail depletion and sales data, account information, retailer and customer information through Vermont Information Processing's ("VIP's") Supplier Reporting System ("SRS") only after executing a separate written confidentiality agreement dated January 3, 2024, signed by Angus Rittenburg, the CEO of Canvas, on behalf of Wherehouse Beverage Co./WYNK (the "VIP/SRS Confidentiality Agreement"). The VIP/SRS Confidentiality Agreement provides that the depletion data is proprietary to Glunz and "private and confidential," limits use "solely for internal sales and marketing analytical purposes," requires maintenance "in the strictest of confidence," and prohibits disclosure "to any other parties" during or after the relationship. Access to Glunz's VIP/SRS instance is credential gated to designated supplier users approved by Glunz.

23. Glunz launched WYNK from negligible sales in Illinois and drove explosive growth and chain penetration from the beginning of the parties' relationship through October of 2025. Glunz put much time and effort into making WYNK a recognized brand with repeat sales and grew the customer base to a point where the WYNK brand also generated tie-in sales ("door opening" sales) for other products that Glunz sold in addition to WYNK.

24. Canvas personnel repeatedly recognized Glunz as the number-one WYNK wholesaler nationally. Glunz serviced more than a thousand active retail doors with strong velocity and broad chain penetration, and invested materially to enable and foster WYNK's Illinois success.

25. On or about August 28, 2025, Canvas issued a notice purporting to terminate or transition the distributorship (the "Termination Notice") without cause or Good Cause expressly pursuant to Paragraph 5 of the Agreement and without satisfying the conditions precedent set forth in the Agreement. For more than two weeks before Canvas's termination notice, Glunz requested a face-to-face meeting after credible market rumors indicated Canvas had targeted a significant chain placement and contemplated a departure. Glunz sent multiple texts and emails and requested calls. Canvas declined to engage and then delivered a termination notice.

26. On information and belief, Canvas discussed issues regarding transferring the brand with other distributors, Glunz's direct competitors in the marketplace before and after issuing the Termination Notice and at some time following deciding to terminate, Canvas also commenced onboarding or sales via one or more successor distributors and communicated

with retailers in a manner that caused confusion about Glunz's authorization and status and took advantage of Glunz's confidential information by allowing Canvas and the successor distributors to target the accounts Glunz had placed Wynk in and to step into Glunz's shoes as distributors of Wynk building on the goodwill and brand value Glunz had created without needing to create it themselves, which would have taken time and effort akin to starting the brand from scratch as Glunz did with Wynk.

27. Prior to and after the "Termination Notice" multiple buyers and distributor personnel reported that Canvas representatives (including Canvas's Illinois-based sales representatives) and Glunz's competitor wholesalers were communicating that Canvas was transitioning the WYNK brand to other distributors and instructing retailers to hold or reroute orders, which caused immediate confusion and delays.

28. By way of example, buyers at Binny's Arlington Heights, Lake Zurich, and Vernon Hills locations reported such messages; retailers such as D'Agostino's and Gas N Wash reported receiving similar communications; and additional accounts-including Extra Value Baileys, Star 7, JP Liquors, Chestnut Liquors, Fresh Thyme, Circle K, and Northbrook Sunset Foods reported confusion about Glunz's authorization status following supplier-side messaging.

29. All this reduced Glunz's sales and profit and caused marketplace confusion and is evidence that it is more likely than not that Canvas was having discussions with competitors and customers of Glunz involving Glunz's confidential information in violation of the Agreement and the VIP/SRS Confidentiality Agreement.

30. Canvas accessed and used Glunz's confidential information beyond the scope permitted by the Agreement and applicable law to facilitate a successor handoff.

31. In letters dated September 2 and October 9, 2025, Glunz demanded Canvas's preservation of exclusivity and compliance with confidentiality obligations.

32. Before and during the notice period—and prior to any tender—Canvas diverted orders, features, and programs away from Glunz and directed or encouraged retailers to pause, delay, or reroute orders, depriving Glunz of profits it would have earned during the pendency of this dispute.

33. On information and belief, Canvas also withheld hiring additional sales representatives for the territory until such time as Glunz's competitors were selling the brand and shared Glunz's confidential information with third parties in violation off the Agreement and the VIP/SRS Confidentiality Agreement.

34. In late October, Canvas tendered an amount Canvas claimed to be equal to the contractual three-times trailing gross-profit floor and completed the inventory and paid-POS buyback at laid-in cost, but it did not pay the full fair-market value owed under the Agreement.

35. The Agreement's three-times-gross-profit metric is a floor, not a cap. FMV may, and here does, exceed the floor given Glunz's growth trajectory, investments, approvals, and comparable transactions.

36. Recent industry transactions for high-growth beverage brands have reflected double-digit gross profit multiples, whether calculated by discounted cash flow analysis or the market multiple approach, particularly where the distributor played a pivotal role in launching and scaling the brand from inception. Consistent with these market comparables, and reflecting the brand's explosive growth under Glunz's stewardship, the amount tendered by Canvas is a small fraction of this FMV.

37. Glunz is entitled to greater compensation for the FMV.

38. Unless enjoined, Canvas's conduct threatens continued diversion, confusion, erosion of goodwill, and misuse of confidential information that legal remedies alone cannot fully redress.

39. Thus, without the injunctive relief requested herein, Glunz will continue to suffer substantial and irreparable harm for which there is no adequate remedy at law.

## Count I - Breach of Contract

40. Glunz incorporates paragraphs 1 through 39 as though fully set forth herein.

41. The Agreement is valid and enforceable. Glunz performed all obligations and conditions precedent, or they were waived or excused by Canvas' conduct.

42. The Agreement requires Canvas to complete specified conditions precedent—including full FMV payment as determined and paid per the Agreement's terms—before terminating exclusivity or appointing a successor distributor in the Territory.

43. The Agreement expressly defines the three-times trailing-twelve-month gross-profit figure as a minimum floor and not as the fair-market value of Glunz's distribution rights. Canvas's late-October 2025 tender equaled approximately the contractual floor and therefore did not satisfy its obligation to pay the full fair-market value determined and paid in accordance with the Agreement's procedures.

44. Fair-market value for Glunz's exclusive distribution rights materially exceeds the three-times floor given the brand's growth, established approvals, and market comparables. Canvas's appointment of or sales through successor distributors before paying full fair-market value breached the Agreement.

45. Canvas breached the Agreement by failing to pay the full FMV as required; appointing or selling through a successor in the Territory before satisfying the conditions precedent; and misusing Glunz's confidential information.

46. Canvas breached the Agreement by sharing Glunz's confidential data with third parties including successor distributors.

47. Canvas also breached the Agreement in failing to utilize commercially reasonable efforts implement brand strategies for the WYNK brand, withholding efforts at promotion until after transitioning the WYNK brand to successor distributors, and communicating with retailers about a transition prior to fulfilling the Agreements' terms and thereby diminishing Glunz's sales.

48. As a direct and proximate result, Glunz suffered damages, including but not limited to the unpaid valuation amount, profits Glunz would have earned on sales of WYNK products until such time as Canvas pays the fair market value (the profits other distributors are currently making), lost program and feature opportunities and cross sales and sales of other products Glunz would have made given the door opening nature of the WYNK brand, profits Glunz could have made up to the date of termination had Canvas acted in good faith and provided the programming and not informed retailers and third parties about the pending termination, and other consequential damages.

**Count II - Misappropriation of Trade Secrets under the DTSA, 18 U.S.C. § 1836,** *et seq.*

49. Glunz incorporates paragraphs 1 through 48 as though fully set forth herein.

50. Glunz possesses trade secrets within the meaning of the DTSA, including non-public, account-level and go-to-market information that derives independent economic value from not being generally known and not readily ascertainable. These trade secrets include, without limitation, retailer-level points of contact and relationship histories; customer-specific pricing and discount ladders and promotional terms; promotion cadence, feature and reset calendars, and activation pipelines by account and channel; approval statuses, and reset timing; depletion histories, velocity and mix by account and SKU, forecasting models, and route-to-market strategies; sales call notes, opportunity funnels, and launch plans for pending activations and new accounts; and internal presentations, sell-in decks, and retailer-specific standard operating procedures reflecting non-public terms and strategies.

51. Glunz owns the trade secrets identified herein.

52. Glunz took reasonable measures to maintain the secrecy of this information, including contractual confidentiality provisions and restrictions in the parties' Agreement; limiting access to password-protected systems and files on a need-to-know basis; enforcing role-based permissions in customer relationship and depletion-reporting tools; defining and handling data as confidential; restricting external sharing to authorized channels subject to confidentiality; and implementing device, network, and email security and off-boarding/return requirements for information shared with Canvas for legitimate brand-management purposes.

53. The trade secrets described above relate to products and services used in, and intended for use in, interstate commerce, including the manufacture, distribution, and sale of WYNK-branded beverages across state lines and to national and regional retail accounts.

54. Canvas acquired, used, and disclosed Glunz's trade secrets without consent and by "improper means." By exceeding the scope of its limited access rights and breaching its confidentiality obligations in the Agreement and the VIP/SRS Confidentiality Agreement, Canvas acquired and used the trade secrets by "improper means" as defined in 18 U.S.C. § 1839(6). Canvas further engaged in improper means by inducing successor distributors, brokers, and agents to use Glunz's trade secrets to solicit and service accounts in the Territory.

55. On information and belief, Canvas's conduct included running and exporting specific VIP/SRS reports-such as "Account Depletions by Item," "Non-Buying Accounts," and "Retail Price Ladder by Account"-before and during the notice period; providing that data to successor distributors and sales representatives to target Glunz-developed accounts and opportunities; and leveraging Glunz's contacts, calendars, and pricing ladders to schedule resets, propose terms, and service accounts after diverting the brand.

56. Canvas's misappropriation was actual and continues. Canvas retains, and has continued to leverage, Glunz's trade secret materials to solicit, service, and expand sales with accounts developed by Glunz and is allowing other distributors to take the funds by way of profits in the sale of Wynk that Glunz should have presently until Wynk pays for the full value owed Glunz, the lost profits Glunz incurred because of Canvas' improper acts are well in excess of $75,000.00, as is the remainder off the fair market value Glunz is still owed.

57. As a direct and proximate result of Canvas's misappropriation, Glunz has suffered and will continue to suffer irreparable harm, including loss of goodwill, customer relationships, and competitive advantage, and has sustained damages in an amount to be proven at trial, including the unjust enrichment caused by Canvas's misappropriation.

58. Canvas's misappropriation was willful and malicious, warranting punitive and exemplary damages and an award of reasonable attorney's fees under the DTSA.

59. Glunz is entitled to injunctive relief under the DTSA prohibiting Canvas and any successor distributor from using or disclosing Glunz's trade secrets; requiring identification of all recipients of Glunz's trade secret information; mandating return or destruction of all such information, with written certification and reasonable remediation to purge systems; requiring forensic preservation of relevant devices and accounts; and allowing limited expedited discovery directed to access, recipients, and accounts activated or serviced using Glunz's information.

60. Legal remedies are inadequate to ensure compliance with the contract's valuation and payment process and to prevent ongoing marketplace disruption, confusion, erosion of goodwill, and ongoing misuse of Glunz's confidential and trade secret information.

61. Glunz seeks an order:

(a) entering targeted injunctive relief to protect Glunz's confidentiality and trade secrets, including:

(i) prohibiting Canvas and any successor distributor from using or disclosing Glunz's confidential and trade secret information;

(ii) requiring identification of all recipients of such information and the return or destruction of all copies, with written certification and reasonable remediation to remove such information from systems;

(iii) imposing a litigation hold and preservation obligations and allowing limited expedited discovery directed to access, recipients, and accounts activated or serviced using Glunz's information;

(iv) prohibiting Canvas and any successor distributor from leveraging Glunz's information to solicit, service, or divert accounts in the Territory pending final judgment; and

(v) tendering the profits derived from all sales since Canvas' improper conduct to Glunz or awarding Glunz an amount equal to the amount the profits derived from the sales which would have been Glunz's sales save for Canvas' improper conduct.

**Count III — Misappropriation of Trade Secrets under the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.***

62. Plaintiff realleges and incorporates by reference paragraphs 1 through 61 as though fully set forth herein.

63. The confidential business information described above constitutes "trade secrets" owned by Glunz within the meaning of 765 ILCS 1065/2(d). The information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. This compilation is not readily ascertainable because it reflects longitudinal, account-level data that is not publicly visible and would require substantial time and expense to recreate. Glunz undertook reasonable efforts to maintain its secrecy, including the contractual, technical, and administrative measures alleged herein.

64. Canvas acquired, disclosed, and used Glunz's trade secrets by "improper means" within the meaning of 765 ILCS 1065/2(a) and 2(b). By exceeding its authorized access and breaching contractual duties to maintain secrecy and limit use under the Agreement and the

VIP/SRS Confidentiality Agreement, Canvas engaged in misappropriation of Glunz's trade secrets. Canvas further did so by inducing successor distributors, brokers, and agents to use Glunz's trade secrets to solicit and service accounts in the Territory.

65. Canvas's misappropriation was both actual and threatened. On information and belief, Canvas exported and disseminated Glunz's trade secret reports and pipelines-including reports identifying account-level depletions, pricing, and non-buying accounts-before and during the notice period and continues to retain and leverage those materials to target Glunz-developed accounts.

66. As a direct and proximate result, Glunz has suffered and will continue to suffer irreparable harm, including loss of goodwill, customer relationships, and competitive advantage, and has sustained damages in an amount to be proven at trial, including the unjust enrichment caused by Canvas's misappropriation.

67. Canvas's misappropriation was willful and malicious. Glunz is entitled to injunctive relief under 765 ILCS 1065/3 prohibiting use or disclosure of its trade secrets; requiring identification of all recipients; return or destruction of all copies with certification; and reasonable remediation to purge systems. Glunz is further entitled to damages under 765 ILCS 1065/4(a) for its actual loss and for Canvas's unjust enrichment not otherwise accounted for, exemplary damages up to twice the award under 765 ILCS 1065/4(b), and attorney's fees under 765 ILCS 1065/5.

### Count IV - Unjust Enrichment/Quantum Meruit (In the Alternative and Non-Trade-Secret)

68. Plaintiff realleges and incorporates by reference the factual allegations set forth above to the extent consistent with and not admitting the existence of an enforceable contract governing the subject matter of this Count. This Count is pled in the alternative to the contract-based claims. If the Agreement or any valuation provision is determined to be unenforceable, inapplicable, or not to fully govern the parties' rights with respect to the benefits described herein, equity requires restitution.

69. Glunz conferred substantial, non-gratuitous benefits on Canvas, including building the WYNK brand from launch in the Territory; developing and maintaining retailer relationships; obtaining account approvals; securing placements and resets; creating account-specific activation pipelines and sell-in materials; executing promotions and features; investing sales coverage and marketing resources; and developing a functioning route-to-market for WYNK.

70. Canvas knew of, accepted, and retained those benefits. Canvas leveraged Glunz's brand building, approvals, placements, pipelines, and relationships to transition WYNK to successor distributors who stepped into Glunz's work product and began earning profits from accounts and placements Glunz developed.

71. Under the circumstances, it would be unjust for Canvas to retain these benefits without paying their reasonable value. Equity requires that Canvas make restitution for the benefits conferred and unjust enrichment retained, particularly where Canvas tendered only a floor-level amount and diverted the brand to successors who harvested Glunz-developed accounts and placements.

72. This Count is asserted on a non-trade-secret basis and does not rely on misappropriation of trade secrets (which is addressed in Counts II and III). The unjust enrichment and quantum meruit theories here are based on Glunz's brand-building services and marketplace benefits conferred independent of trade-secret status.

73. For quantum meruit, Glunz performed valuable services for Canvas as described; Glunz did so with the expectation of payment of their reasonable value; Canvas accepted and benefited from those services; and, to the extent the Agreement or any valuation provision is unenforceable, inapplicable, or does not fully address these benefits, Canvas has failed to pay their reasonable value.

74. Glunz seeks restitution measured by (i) the fair and reasonable value of the services and benefits conferred; and (ii) Canvas's unjust enrichment not otherwise accounted for, including, without limitation, profits Canvas and its successor distributors realized from sales to accounts and placements developed by Glunz. Glunz further seeks an accounting, disgorgement, and imposition of a constructive trust over revenues and profits attributable to such benefits.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant and award:

a. Compensatory damages on the contract, including (i) the contractual valuation of Glunz's distribution rights (not less than the agreed floor and as determined under the Agreement's procedures), (ii) profits Glunz would have earned on sales in the Territory during the pendency of this dispute but for Canvas's pre-payment diversion, (iii) lost program and feature opportunities, (iv) lost profits and the profits earned by others that would have been Glunz's but for Canvas's improper conduct, and (v) other consequential damages, with pre- and post-judgment interest;

b. Specific performance compelling Canvas to pay the full FMV determined and paid per the Agreement's procedures before any lawful distributor change;

c. Preliminary and permanent injunctive relief (i) prohibiting Canvas from terminating Glunz's exclusivity in the Territory or appointing/selling through a successor until the conditions precedent are satisfied; (ii) enjoining Canvas from using or disclosing Glunz's trade secrets and ordering identification of recipients, return/destruction, and remediation; (iii) requiring corrective communications to retailers regarding Glunz's continued authorization pending Canvas's performance; and (iv) enjoining Canvas from using any Glunz confidential information referenced

herein and requiring the destruction of all such information, including all information derived from such information (including any copies, electronic embodiments, and notes thereof).

d. Equitable restitution, including an accounting of all sales into the Territory from the date of notice through satisfaction of the conditions precedent;

e. Exemplary damages, punitive damages, and attorney's fees under DTSA/ITSA for willful and malicious misappropriation, and fees/costs as permitted by contract or statute;

g. Costs of suit; and

h. Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Glunz hereby demands a jury trial on all issues so triable.

Dated: <u>January 30, 2026</u>　　　　　　　　　　Respectfully submitted,

**LOUIS GLUNZ BEER, INC.**

<u>/s:/ Ashley W. Brandt</u>

One of Its Attorneys

Ashley W. Brandt #6281068
Daniel Curth #6229090
Gregory Abrams #6280767
Tucker Ellis LLP
233 South Wacker Drive
Suite 6950
Chicago, IL 60606
Telephone: 312.624.6300
Ashley.Brandt@TuckerEllis.com
Daniel.Curth@TuckerEllis.com
Gregory.Abrams@TuckerEllis.com