**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LOUIS GLUNZ BEER, INC.,

                                **Plaintiff,**              **Case No. 26 CV 1124**

    **vs.**

CANVAS 340, LLC,

                                **Defendant.**

**DEFENDANT CANVAS 340, LLC's
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, Defendant Canvas 340, LLC ("Defendant" or "Canvas"), by and through its counsel, submits this Partial Answer to the Complaint filed by Plaintiff Louis Glunz Beer, Inc. ("Plaintiff" or "Glunz"). Defendant has moved to dismiss Counts II, III, and IV pursuant to Rule 12(b)(6) and therefore responds only to the factual allegations relevant to Count I (Breach of Contract) and not the allegations directed to the claims that are subject to the Motion to Dismiss.

1

## Introduction

Plaintiff Louis Glunz Beer, Inc. ("Glunz") brings this action to end, and be made whole for, a scheme by Defendant Canvas 340, LLC ("Canvas") to terminate Glunz's exclusive distributorship for the WYNK beverage brand without fully remunerating Glunz for the value of that distributorship. After Glunz built the brand from minimal sales to a category leader in its territory, Canvas issued a notice to terminate without good cause and orchestrated a transition to new distributors in violation of its contractual and statutory obligations. This improper conduct included withholding retailer activations, diverting new accounts from Glunz for Canvas's own benefit, and tendering only a fraction of the contractually required fair-market value ("FMV") for Glunz's distribution rights. Additionally, Canvas accessed, used, and disclosed Glunz's confidential trade secrets—including its account-level sales data and retailer roadmap—to enable the new distributors to step into Glunz's position, in breach of the parties' Agreement (defined below) and in violation of the Defend Trade Secrets Act and the Illinois Trade Secrets Act. Glunz seeks all available contractual, statutory, and equitable relief, including but not limited to payment of the full FMV, damages for lost profits, and appropriate injunctive and declaratory relief.

**ANSWER:** The Introductory Section of the Plaintiff's Complaint is a description of Plaintiff's allegations and claims contained in the Complaint, pled improperly and contrary to Rules 8(a) and 10(b) of the Federal Rules of Civil Procedure. To the extent any response is required, these allegations are denied.

### Parties

1. Plaintiff Louis Glunz Beer, Inc., is an Illinois corporation with its principal place of business at 7100 Capitol Drive, Lincolnwood, Illinois.

**ANSWER:** The allegations in Paragraph 1 are admitted, upon information and belief.

2. Defendant Canvas 340, LLC ("Canvas'") is a United States Virgin Islands limited liability company with its principal office at East End Plaza, Suite 120, 6115 Smith Bay, Charlotte Amalie, United States Virgin Islands 00802.

**ANSWER:** The allegations in Paragraph 2 are admitted except as to the principal place of business, which are denied.

3. Upon information and belief, its members include Shawn P. Sheehan and the Shawn P. Sheehan Revocable Trust. Neither is a resident nor a citizen of Illinois.

2

**Answer**: Defendant admits that the Shawn P. Sheehan Revocable Trust is a member and that the Revocable Trust is not a resident or citizen of Illinois. The remaining allegations in Paragraph 3 are denied.

4. Canvas regularly conducts business in this District, including through distribution of WYNK-branded products and retailer-facing activities.

**ANSWER:** Defendant admits that it regularly conducts business in this District, including through sales to distributors of WYNK-branded products and retailer-facing activities. The remaining allegations in Paragraph 4 are denied.

**Jurisdiction and Venue**

5. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. The Court has supplemental jurisdiction over the related state-law claims asserted in this case under 28 U.S.C. § 1367(a).

**ANSWER:** The allegations in Paragraph 5 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is required, Defendant admits the Court has jurisdiction over the Parties and the claims and defenses asserted in this action. To the extent any further response is required, the factual allegations in Paragraph 5 are denied.

6. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

**ANSWER:** The allegations in Paragraph 6 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is required, Defendant admits that the parties are diverse but denies that Plaintiff is entitled to any amount of damages.

7.     Personal jurisdiction is proper because Canvas transacted business and committed tortious and contractual acts in this District, purposefully directed relevant conduct at this forum, and consented to jurisdiction pursuant to the parties' agreement.

**ANSWER:**     The allegations in Paragraph 7 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is required, these allegations are denied.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to the claims occurred here and because Glunz resides in this District and Canvas is subject to personal jurisdiction here.

**ANSWER:**     The allegations in Paragraph 8 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is required, Defendant admits the contract at issue in this case occurred in this District and venue is appropriate here.

9.     Moreover, Canvas agreed and consented to litigation occurring in courts in Cook County, Illinois, and to the exclusive jurisdiction and venue of the courts within Cook County.

**ANSWER:**     The allegations in Paragraph 8 of the Complaint constitute legal conclusions to which no response is required. To the extent any further response is required, Defendant admits that the contract at issue in this matter identifies the courts within Cook County as appropriate courts to hear this dispute. Any remaining factual allegations in Paragraph 7 are denied.

**Factual Allegations**

10.     Glunz is a family-owned and operated beverage distributor with over a century of experience serving the Chicagoland area. It is one of the most respected and well-established distributors of domestic, craft, and imported beers, as well as a growing portfolio of specialty beverages, including ciders, seltzers, and non-alcoholic products, in its territory.

**ANSWER:** Canvas admits Glunz is a beverage distributor serving the Chicagoland area. The remaining factual allegations in Paragraph 10 are denied.

11. Canvas produces and supplies WYNK-branded beverages, a line of alcohol-free seltzers containing hemp-derived cannabinoids. Canvas markets and sells these products nationwide through a network of distributors, including Glunz.

**ANSWER:** The allegations in Paragraph 11 are admitted.

12. Prior to partnering with Glunz, Canvas had no distribution network, negligible sales, and no brand recognition for WYNK in Illinois. The WYNK brand and its hemp-derived beverage category were entirely new and unknown to retailers and consumers in the territory where Canvas sought to enter.

**ANSWER:** Canvas admits that Glunz was its initial distributor in the Chicago area pursuant to their contractual agreement and that the Agreement speaks for itself. The remaining allegations in Paragraph 12 are denied.

13. Canvas sought out Glunz specifically for its deep experience, strong retailer relationships, and proven ability to build new and niche brands in the competitive Chicagoland market.

**ANSWER:** Canvas admits that it had hoped Glunz's advertised experience, the strong retailer relationships it claimed to have, and its ability to grow brands would assist Canvas in its introduction and growth in the Chicagoland market, as reflected in the Agreement the Parties executed. The remaining allegations in Paragraph 13 are denied.

14. Beginning in 2023, following discussion between Canvas and Glunz, Glunz agreed to launch the WYNK brand and invested substantial time, money, and resources to create a market for WYNK that did not previously exist. This included educating retailers and consumers about an

entirely new product category, securing initial placements, and generating the initial sales velocity and consumer demand from a standing start.

**ANSWER:** Canvas admits that the parties executed the Agreement, that both operated under its requirements and obligations for nearly two years, and that Canvas compensated Glunz appropriately in accordance with each of the Agreement's contractual terms. The remaining allegations in Paragraph 14 are denied.

15. On or about October 20, 2023, Glunz and Canvas memorialized their relationship by entering into a written distribution agreement (the "Agreement") granting Glunz exclusive distribution rights for WYNK-branded products within a defined territory (the "Territory").

**ANSWER:** Canvas admits that the Parties executed the Agreement and that the Agreement speaks for itself. The remaining allegations in Paragraph 15 are denied.

16. The Agreement is a written exclusive distributorship that grants Glunz sole rights to distribute WYNK-branded products within a defined Illinois territory and sets the framework for the parties' performance, confidentiality, and termination procedures. It provides territorial exclusivity to Glunz and restricts Canvas from appointing or selling through any successor in the Territory absent compliance with express conditions precedent.

**ANSWER:** Canvas admits that the Parties executed the Agreement and that the Agreement speaks for itself. The remaining allegations in Paragraph 16 are denied as untrue.

17. Absent "Good Cause," or certain limited "cause" events, the Agreement prohibits termination of Glunz's exclusive rights or appointment of a successor distributor unless and until Canvas first satisfies specified conditions precedent. Paragraph 5 of the Agreement states:

6

> 5.      **Termination or Failure to Renew Without Good Cause.** Supplier may terminate or fail to renew this Agreement without Good Cause upon sixty (60) days prior notice. In the event that Supplier terminates or fails to renew, this Agreement without Good Cause, then within sixty (60) days of the notice of termination, Supplier shall pay Distributor an amount equal to the fair market value of Distributor's distribution rights which shall not be less than three (3) times Distributor's twelve (12) months trailing gross profit on the sale of the Products sold by Distributor in the Territory (the "Compensation"). If this option is exercised within twelve (12) months of the Effective Date, Supplier shall pay Distributor an amount equal to three (3) times Distributor's average monthly gross profit on the sale of the Products sold by Distributor in the Territory multiplied by twelve (12). Distributor agrees and acknowledges that notwithstanding any other provision of this Agreement, the Compensation was mutually agreed upon. The payment shall be in addition to any amounts payable for inventories under Section 4(e). Provided the Compensation is promptly paid in accordance with this subsection, Distributor agrees that: (i) the Compensation constitutes Distributor's sole compensation of any kind to which it is entitled for the termination of the Agreement by Supplier; and (ii) the Compensation represents full and fair compensation to Distributor for the termination of this Agreement and Distributor's loss of the distribution rights hereunder.

**ANSWER:**    The allegations in Paragraph 17 are denied as untrue, although Canvas admits that a portion of the Agreement is copied.

18.     The Agreement further protects Glunz's confidential and trade secret information, including retailer contacts. sales levels, depletion amounts, retailer purchasing information, pricing ladders, promotion cadence, feature/reset calendars, and sales programs. It restricts use of such data to authorized purposes and prohibits disclosure to third parties absent consent or express permission. As stated in Paragraph 8(d) of the Agreement:

7

(d)     Confidentiality. Each party acknowledges and agrees that, during the Term and for period of one (1) year thereafter, the non-disclosing party shall (i) protect the Confidential Information (as such term is hereinafter defined) of the disclosing party with at least the same degree of care as the non-disclosing party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care, and (ii) not disclose, copy, download or use for the direct or indirect benefit of any third party any Confidential Information. The term "Confidential Information" shall mean trade secrets, product innovations, and business plans, sales reports, customer lists, depletion reports and other sales related data. Confidential Information shall not include information that (A) is or becomes part of the public domain through no act or omission attributable to the non-disclosing party; (B) is or becomes available to the non-disclosing party from an independent source without breach of any confidentiality obligations owed to the disclosing party; (C) was lawfully in possession of, developed by, or known by the non-disclosing party prior to receiving it from the disclosing party; (D) is released after prior written authorization by the disclosing Party; or (v) is required by law, to be disclosed; provided, however, that, if disclosure is required by law, the non-disclosing Party shall provide the disclosing Party with prompt notice of such requirement so that the disclosing Party may seek protection of the Confidential Information.

ANSWER:     Canvas admits that the Parties executed the Agreement and that the Agreement (and terms, including Paragraph 8(d)) speaks for itself. Canvas denies the remainder of the allegations in Paragraph 16.

19.     Glunz also provided Canvas with confidential information from Glunz's sales representatives and their specialized knowledge regarding the market and allowed Canvas representatives to work directly with Glunz sales representatives and obtain the proprietary and confidential information related to sales, ordering and account data and information.

**ANSWER:**     Canvas admits that the Parties exchanged information in the ordinary course of their contractual relationship as contemplated and permitted by the Agreement but denies that any of that information was confidential information of Plaintiff.

20.     All of this confidential information has independent economic value from not being generally known and not being readily ascertainable by proper means by others who could obtain economic value from their disclosure or use. In particular, because the datasets reveal—at a granular, account-specific level—which stores buy which SKUs, at what price points, on what cadence, with which features, and under which buyer preferences, they enable a competitor or

successor distributor to: (a) target high-yield doors immediately; (b) undercut Glunz's negotiated price strategies with precision; and (c) time promotions and solicitations to leapfrog fixed planogram resets and feature windows, producing rapid store-by-store displacement that cannot be recreated after the fact. The breadth, recency, and store-level curation of the VIP/SRS exports and dashboards make replication through proper means extraordinarily difficult and time-consuming; reconstructing weekly depletions, pricing histories, compliance notes, planogram placements, and buyer-preference insights across hundreds of accounts would require extensive cooperation and resources and would remain incomplete even with substantial effort. These competitive advantages exist precisely because Glunz's compilations are secret and non-public; Glunz does not publish the information, and it is not available from public sources in compiled, account-level form.

**ANSWER:** The allegations in Paragraph 20 are denied.

21. Glunz protects this information by among other measures, requiring written confidentiality agreements, restricting access on a need-to-know basis through role-based permissions, enforcing password authentication, labeling materials as confidential, issuing unique and limited supplier credentials for internal analytics, and implementing off-boarding and audit controls; the Agreement also defines sales reports, customer lists, depletion reports, and sales-related data as confidential.

**ANSWER:** Canvas admits that Paragraph 8(d) of the Agreement contains a confidentiality provision, that the provision and the Agreement speak for themselves, and that Canvas has honored all terms of the Agreement. All further allegations in Paragraph 21 are denied.

22. In addition to the data Glunz shared with Canvas, Canvas obtained credentialed access to Glunz's account-level retail depletion and sales data, account information, retailer and

customer information through Vermont Information Processing's ("VIP's") Supplier Reporting System ("SRS") only after executing a separate written confidentiality agreement dated January 3, 2024, signed by Angus Rittenburg, the CEO of Canvas, on behalf of Wherehouse Beverage Co./WYNK (the "VIP/SRS Confidentiality Agreement"). The VIP/SRS Confidentiality Agreement provides that the depletion data is proprietary to Glunz and "private and confidential," limits use "solely for internal sales and marketing analytical purposes," requires maintenance "in the strictest of confidence," and prohibits disclosure "to any other parties" during or after the relationship. Access to Glunz's VIP/SRS instance is credential-gated to designated supplier users approved by Glunz.

**ANSWER:** Canvas admits that it had access to its own account-level retail depletion and sales data, account information, retailer and customer information through Vermont Information Processing's ("VIP's") Supplier Reporting System ("SRS'") and that it signed a letter agreement dated January 3, 2024 which speaks for itself. Canvas denies the remaining allegations in Paragraph 22.

23. Glunz launched WYNK from negligible sales in Illinois and drove explosive growth and chain penetration from the beginning of the parties' relationship through October of 2025. Glunz put much time and effort into making WYNK a recognized brand with repeat sales and grew the customer base to a point where the WYNK brand also generated tie-in sales ("door opening" sales) for other products that Glunz sold in addition to WYNK.

**ANSWER:** Canvas admits that its initial distributor in the Chicago area was Glunz, that the Parties were expected to execute their obligations under the Agreement, and that the Parties were both expected to expend time, effort and financial resources under the Agreement. Canvas admits that the sales data during the term of the Agreement speaks for itself. The remaining allegations in Paragraph 23 are denied.

10

24.     Canvas personnel repeatedly recognized Glunz as the number-one WYNK wholesaler nationally. Glunz serviced more than a thousand active retail doors with strong velocity and broad chain penetration, and invested materially to enable and foster WYNK's Illinois success.

**ANSWER:**     Canvas admits that Glunz serviced retail doors on behalf of Canvas pursuant to its obligations under the Agreement, for which Glunz was properly compensated. The remaining allegations in Paragraph 24 are denied.

25.     On or about August 28, 2025, Canvas issued a notice purporting to terminate or transition the distributorship (the "Termination Notice") without cause or Good Cause expressly pursuant to Paragraph 5 of the Agreement and without satisfying the conditions precedent set forth in the Agreement. For more than two weeks before Canvas's termination notice, Glunz requested a face-to-face meeting after credible market rumors indicated Canvas had targeted a significant chain placement and contemplated a departure. Glunz sent multiple texts and emails and requested calls. Canvas declined to engage and then delivered a termination notice.

**ANSWER:**     Canvas admits that it issued the Termination Notice on August 28, 2025, in accordance with the terms of the Agreement. All further allegations in this paragraph are denied.

26.     On information and belief, Canvas discussed issues regarding transferring the brand with other distributors, Glunz's direct competitors in the marketplace before and after issuing the Termination Notice and at some time following deciding to terminate, Canvas also commenced onboarding or sales via one or more successor distributors and communicated with retailers in a manner that caused confusion about Glunz's authorization and status and took advantage of Glunz's confidential information by allowing Canvas and the successor distributors to target the accounts Glunz had placed Wynk in and to step into Glunz's shoes as distributors of Wynk building on the

11

goodwill and brand value Glunz had created without needing to create it themselves, which would have taken time and effort akin to starting the brand from scratch as Glunz did with Wynk.

**ANSWER:** Canvas denies that it had any inappropriate discussions with Glunz's direct competitors in the marketplace before issuing the Termination Notice. Canvas admits that, in the ordinary course of business, it made plans for its future after the Agreement was terminated, and that it did so without violating the confidentiality provision or any other terms of the Agreement. Canvas admits that it planned for and ultimately selected a successor distributor, as contemplated by the Agreement, and did so without violating the confidentiality provision or any other terms of the Agreement. All further allegations of Paragraph 26 are denied.

27. Prior to and after the "Termination Notice" multiple buyers and distributor personnel reported that Canvas representatives (including Canvas's Illinois-based sales representatives) and Glunz's competitor wholesalers were communicating that Canvas was transitioning the WYNK brand to other distributors and instructing retailers to hold or reroute orders, which caused immediate confusion and delays.

**ANSWER:** Canvas lacks sufficient information to admit or deny the allegations in Paragraph 27. To the extent any further response is required, the allegations in Paragraph 27 are denied.

28. By way of example, buyers at Binny's Arlington Heights, Lake Zurich, and Vernon Hills locations reported such messages; retailers such as D'Agostino's and Gas N Wash reported receiving similar communications; and additional accounts-including Extra Value Baileys, Star 7, JP Liquors, Chestnut Liquors, Fresh Thyme, Circle K, and Northbrook Sunset Foods reported confusion about Glunz's authorization status following supplier-side messaging.

**ANSWER:** Canvas lacks sufficient information to admit or deny the allegations in Paragraph 28. To the extent any further response is required, the allegations in Paragraph 28 are denied.

29. All this reduced Glunz's sales and profit and caused marketplace confusion and is evidence that it is more likely than not that Canvas was having discussions with competitors and customers of Glunz involving Glunz's confidential information in violation of the Agreement and the VIP/SRS Confidentiality Agreement.

**ANSWER:** The allegations in Paragraph 29 are denied as untrue.

30. Canvas accessed and used Glunz's confidential information beyond the scope permitted by the Agreement and applicable law to facilitate a successor handoff.

**ANSWER:** The allegations in Paragraph 30 are denied as untrue.

31. In letters dated September 2 and October 9, 2025, Glunz demanded Canvas's preservation of exclusivity and compliance with confidentiality obligations.

**ANSWER:** Canvas admits Glunz delivered "letters dated September 2 and October 9, 2025" to Canvas that speak for themselves. The remaining allegations in Paragraph 31 are denied as untrue.

32. Before and during the notice period—and prior to any tender—Canvas diverted orders, features, and programs away from Glunz and directed or encouraged retailers to pause, delay, or reroute orders, depriving Glunz of profits it would have earned during the pendency of this dispute.

**ANSWER:** The allegations in Paragraph 32 are denied as untrue.

33. On information and belief, Canvas also withheld hiring additional sales representatives for the territory until such time as Glunz's competitors were selling the brand and

shared Glunz's confidential information with third parties in violation of the Agreement and the VIP/SRS Confidentiality Agreement.

**ANSWER:** The allegations in Paragraph 33 are denied as untrue.

34. In late October, Canvas tendered an amount Canvas claimed to be equal to the contractual three-times trailing gross-profit floor and completed the inventory and paid-POS buyback at laid-in cost, but it did not pay the full fair-market value owed under the Agreement.

**ANSWER:** Canvas admits that it tendered the contractual amount Canvas asserts is the amount required under the Agreement according to its terms. The remaining allegations in Paragraph 34 are denied as untrue.

35. The Agreement's three-times-gross-profit metric is a floor, not a cap. FMV may, and here does, exceed the floor given Glunz's growth trajectory, investments, approvals, and comparable transactions.

**ANSWER:** The allegations in Paragraph 35 are denied as untrue.

36. Recent industry transactions for high-growth beverage brands have reflected double-digit gross profit multiples, whether calculated by discounted cash flow analysis or the market multiple approach, particularly where the distributor played a pivotal role in launching and scaling the brand from inception. Consistent with these market comparables, and reflecting the brand's explosive growth under Glunz's stewardship, the amount tendered by Canvas is a small fraction of this FMV.

**ANSWER:** The allegations in Paragraph 36 are denied as untrue.

37. Glunz is entitled to greater compensation for the FMV.

**ANSWER:** The allegations in Paragraph 37 are denied as untrue.

14

38. Unless enjoined, Canvas's conduct threatens continued diversion, confusion, erosion of goodwill, and misuse of confidential information that legal remedies alone cannot fully redress.

**ANSWER:** The allegations in Paragraph 38 are denied as untrue.

39. Thus, without the injunctive relief requested herein, Glunz will continue to suffer substantial and irreparable harm for which there is no adequate remedy at law.

**ANSWER:** The allegations in Paragraph 39 are denied as untrue.

**Count I - Breach of Contract**

40. Glunz incorporates paragraphs l through 39 as though fully set forth herein.

**ANSWER:** Canvas realleges its responses to each of the foregoing paragraphs and incorporates them herein.

41. The Agreement is valid and enforceable. Glunz performed all obligations and conditions precedent, or they were waived or excused by Canvas's conduct.

**ANSWER:** Canvas admits the Agreement is valid and enforceable. The remaining allegations in Paragraph 41 are denied as untrue.

42. The Agreement requires Canvas to complete specified conditions precedent— including full FMV payment as determined and paid per the Agreement's terms—before terminating exclusivity or appointing a successor distributor in the Territory.

**ANSWER:** The allegations in Paragraph 42 are denied as untrue.

43. The Agreement expressly defines the three-times trailing-twelve-month gross-profit figure as a minimum floor and not as the fair-market value of Glunz's distribution rights. Canvas's late-October 2025 tender equaled approximately the contractual floor and therefore did

15

not satisfy its obligation to pay the full fair-market value determined and paid in accordance with the Agreement's procedures.

**ANSWER:** The allegations in Paragraph 43 are denied as untrue.

44. Fair-market value for Glunz's exclusive distribution rights materially exceeds the three-times floor given the brand's growth, established approvals, and market comparables. Canvas's appointment of or sales through success or distributors before paying full fair-market value breached the Agreement.

**ANSWER:** The allegations in Paragraph 44 are denied as untrue.

45. Canvas breached the Agreement by failing to pay the full FMV as required; appointing or selling through a successor in the Territory before satisfying the conditions precedent; and misusing Glunz's confidential information.

**ANSWER:** The allegations in Paragraph 45 are denied as untrue.

46. Canvas breached the Agreement by sharing Glunz's confidential data with third parties including successor distributors.

**ANSWER:** The allegations in Paragraph 46 are denied as untrue.

47. Canvas also breached the Agreement in failing to utilize commercially reasonable efforts to implement brand strategies for the WYNK brand, withholding efforts at promotion until after transitioning the WYNK brand to successor distributors, and communicating with retailers about a transition prior to fulfilling the Agreements' terms and thereby diminishing Glunz's sales.

**ANSWER:** The allegations in Paragraph 47 are denied as untrue.

48. As a direct and proximate result, Glunz suffered damages, including but not limited to the unpaid valuation amount, profits Glunz would have earned on sales of WYNK products until such time as Canvas pays the fair market value (the profits other distributors are currently making),

lost program and feature opportunities and cross sales and sales of other products Glunz would have made given the door opening nature of the WYNK brand, profits Glunz could have made up to the date of termination had Canvas acted in good faith and provided the programming and not informed retailers and third parties about the pending termination, and other consequential damages.

**ANSWER:** The allegations in Paragraph 48 are denied as untrue.

**Count II - Misappropriation of Trade Secrets under the DTSA, 18 U.S.C. § 1836, et seq.**

49. Glunz incorporates paragraphs 1 through 48 as though fully set forth herein.

**ANSWER:** Canvas realleges its responses to each of the foregoing paragraphs and incorporates them herein.

50. Glunz possesses trade secrets within the meaning of the DTSA, including non-public, account-level and go-to-market information that derives independent economic value from not being generally known and not readily ascertainable. These trade secrets include, without limitation, retailer-level points of contact and relationship histories; customer-specific pricing and discount ladders and promotional terms; promotion cadence, feature and reset calendars, and activation pipelines by account and channel; approval statuses, and reset timing; depletion histories, velocity and mix by account and SKU, forecasting models, and route-to-market strategies; sales call notes, opportunity funnels, and launch plans for pending activations and new accounts; and internal presentations, sell-in decks, and retailer-specific standard operating procedures reflecting non-public terms and strategies.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

17

51.     Glunz owns the trade secrets identified herein.

**ANSWER:**     Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

52.     Glunz took reasonable measures to maintain the secrecy of this information, including contractual confidentiality provisions and restrictions in the parties' Agreement; limiting access to password-protected systems and ft les on a need-to-know basis; enforcing role-based permissions in customer relationship and depletion-reporting tools; defining and handling data as confidential; restricting external sharing to authorized channels subject to confidentiality; and implementing device, network, and email security and off-boarding/return requirements for information shared with Canvas for legitimate brand-management purposes.

**ANSWER:**     Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

53.     The trade secrets described above relate to products and services used in, and intended for use in, interstate commerce, including the manufacture. distribution, and sale of WYNK-branded beverages across state lines and to national and regional retail accounts.

**ANSWER:**     Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

54.     Canvas acquired, used, and disclosed Glunz's trade secrets without consent and by "improper means." By exceeding the scope of its limited access rights and breaching its confidentiality obligations in the Agreement and the VIP/SRS Confidentiality Agreement, Canvas

18

acquired and used the trade secrets by "improper means" as defined in 18 U.S.C. § 1839(6). Canvas further engaged in improper means by inducing successor distributors, brokers, and agents to use Glunz's trade secrets to solicit and service accounts in the Territory.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

55. On information and belief, Canvas's conduct included running and exporting specific VIP/SRS reports-such as "Account Depletions by Item," "Non-Buying Accounts," and "Retail Price Ladder by Account"-before and during the notice period; providing that data to successor distributors and sales representatives to target Glunz-developed accounts and opportunities: and leveraging Glunz's contacts, calendars, and pricing ladders to schedule resets, propose terms, and service accounts after diverting the brand.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

56. Canvas's misappropriation was actual and continues. Canvas retains, and has continued to leverage, Glunz's trade secret materials to solicit, service, and expand sales with accounts developed by Glunz and is allowing other distributors to take the funds by way of profits in the sale of Wynk that Glunz should have presently until Wynk pays for the full value owed Glunz, the lost profits Glunz incurred because of Canvas's improper acts are well in excess of $75,000.00, as is the remainder of the fair market value Glunz is still owed.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

57. As a direct and proximate result of Canvas's misappropriation, Glunz has suffered and will continue to suffer irreparable harm, including loss of goodwill, customer relationships, and competitive advantage, and has sustained damages in an amount to be proven at trial including the unjust enrichment caused by Canvas's misappropriation.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

58. Canvas's misappropriation was willful and malicious, warranting punitive and exemplary damages and an award of reasonable attorney's fees under the DTSA.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

59. Glunz is entitled to injunctive relief under the DTSA prohibiting Canvas and any successor distributor from using or disclosing Glunz's trade secrets; requiring identification of all recipients of Glunz's trade secret information; mandating return or destruction of all such information, with written certification and reasonable remediation to purge systems; requiring forensic preservation of relevant devices and accounts; and allowing limited expedited discovery directed to access, recipients, and accounts activated or serviced using Glunz's information.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

60. Legal remedies are inadequate to ensure compliance with the contract's valuation and payment process and to prevent ongoing marketplace disruption, confusion, erosion of goodwill, and ongoing misuse of Glunz's confidential and trade secret information.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

61. Glunz seeks an order:

(a) entering targeted injunctive relief to protect Glunz's confidentiality and trade secrets, including:

(i) prohibiting Canvas and any successor distributor from using or disclosing Glunz's confidential and trade secret information;

(ii) requiring identification of all recipients of such information and the return or destruction of all copies, with written certification and reasonable remediation to remove such information from systems;

(iii) imposing a litigation hold and preservation obligations and allowing limited expedited discovery directed to access, recipients, and accounts activated or serviced using Glunz's information;

(iv) prohibiting Canvas and any successor distributor from leveraging Glunz's information to solicit, service, or divert accounts in the Territory pending final judgment; and

(v)     tendering the profits derived from all sales since Canvas's improper conduct
to Glunz or awarding Glunz an amount equal to the amount the profits derived from
the sales which would have been Glunz's sales save for Canvas's improper conduct.

**ANSWER:**    Canvas has filed a Motion to Dismiss this claim and defers answering this
Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is
required, Canvas denies the allegation as untrue and states that Plaintiff is entitled to no relief from
this Court.

**Count III - Misappropriation of Trade Secrets under the Illinois Trade Secrets Act, 765 ILCS 1065/1, et seq.**

62.     Plaintiff realleges and incorporates by reference paragraphs 1 through 61 as though
fully set forth herein.

**ANSWER:**    Canvas realleges its responses to each of the foregoing paragraphs and
incorporates them herein.

63.     The confidential business information described above constitutes ·'trade secrets"
owned by Glunz within the meaning of 765 ILCS 1065/2(d). The information derives independent
economic value from not being generally known to, and not being readily ascertainable by proper
means by, other persons who can obtain economic value from its disclosure or use. This
compilation is not readily ascertainable because it reflects longitudinal, account-level data that is
not publicly visible and would require substantial time and expense to recreate. Glunz undertook
reasonable efforts to maintain its secrecy, including the contractual, technical, and administrative
measures alleged herein.

**ANSWER:**    Canvas has filed a Motion to Dismiss this claim and defers answering this
Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is
required, Canvas denies the allegation as untrue.

64. Canvas acquired, disclosed, and used Glunz's trade secrets by "improper means" within the meaning of 765 LCS 1065/2(a) and 2(b). By exceeding its authorized access and breaching contractual duties to maintain secrecy and limit use under the Agreement and the VJP/SRS Confidentiality Agreement, Canvas engaged in misappropriation of Glunz's trade secrets. Canvas further did so by inducing successor distributors, brokers, and agents to use Glunz's trade secrets to solicit and service accounts in the Territory.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

65. Canvas's misappropriation was both actual and threatened. On information and belief, Canvas exported and disseminated Glunz's trade secret reports and pipelines—including reports identifying account-level depletions. pricing and non-buying accounts—before and during the notice period and continues to retain and leverage those materials to target Glunz-developed accounts.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

66. As a direct and proximate result, Glunz has suffered and will continue to suffer irreparable harm, including loss of goodwill, customer relationships, and competitive advantage, and has sustained damages in an amount to be proven at trial, including the unjust enrichment caused by Canvas's misappropriation.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

67. Canvas's misappropriation was willful and malicious. Glunz is entitled to injunctive relief under 765 ILCS 1065/3 prohibiting use or disclosure of its trade secrets; requiring identification of all recipients; return or destruction of all copies with certification; and reasonable remediation to purge systems. Glunz is further entitled to damages under 765 ILCS 1065/4(a) for its actual loss and for Canvas's unjust enrichment not otherwise accounted for, exemplary damages up to twice the award under 765 ILCS 10654(b), and attorney's fees under 765 ILCS I 065/5.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

**Count IV - Unjust Enrichment/Quantum Meruit (In the Alternative and Non-Trade Secret)**

68. Plaintiff realleges and incorporates by reference the factual allegations set forth above to the extent consistent with and not admitting the existence of an enforceable contract governing the subject matter of this Count. This Count is pled in the alternative to the contract-based claims. If the Agreement or any valuation provision is determined to be unenforceable, inapplicable, or not to fully govern the parties' rights with respect to the benefits described herein, equity requires restitution.

**ANSWER:** Canvas realleges its responses to each of the foregoing paragraphs and incorporates them herein. Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

69.    Glunz conferred substantial, non-gratuitous benefits on Canvas, including building the WYNK brand from launch in the Territory; developing and maintaining retailer relationships; obtaining account approvals; securing placements and resets; creating account-specific activation pipelines and sell-in materials; executing promotions and features; investing sales coverage and marketing resources; and developing a functioning route-to-market for WYNK.

**ANSWER:**    Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

70.    Canvas knew of, accepted, and retained those benefits. Canvas leveraged Glunz's brand building, approvals, placements, pipelines, and relationships to transition WYNK to successor distributors who stepped into Glunz's work product and began earning profits from accounts and placements Glunz developed.

**ANSWER:**    Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

71.    Under the circumstances, it would be unjust for Canvas to retain these benefits without paying their reasonable value. Equity requires that Canvas make restitution for the benefits conferred and unjust enrichment retained, particularly where Canvas tendered only a floor-level amount and diverted the brand to successors who harvested Glunz-developed accounts and placements.

**ANSWER:**    Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

72. This Count is asserted on a non-trade-secret basis and does not rely on misappropriation of trade secrets (which is addressed in Counts IT and Ill). The unjust enrichment and quantum meruit theories here are based on Glunz's brand-building services and marketplace benefits conferred independent of trade-secret status.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

73. For quantum meruit, Glunz performed valuable services for Canvas as described; Glunz did so with the expectation of payment of their reasonable value: Canvas accepted and benefited from those services; and, to the extent the Agreement or any valuation provision is unenforceable, inapplicable, or does not fully address these benefits, Canvas has failed to pay their reasonable value.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

74. Glunz seeks restitution measured by (i) the fair and reasonable value of the services and benefits conferred; and (ii) Canvas's unjust enrichment not otherwise accounted for, including, without limitation, profits Canvas and its successor distributors realized from sales to accounts and placements developed by Glunz. Glunz further seeks an accounting, disgorgement, and imposition of a constructive trust over revenues and profits attributable to such benefits.

**ANSWER:** Canvas has filed a Motion to Dismiss this claim and defers answering this Paragraph until resolution of the Motion to Dismiss or further order of this Court. If an answer is required, Canvas denies the allegation as untrue.

WHEREFORE, Counter-Plaintiff, Canvas 340, LLC, prays that this Honorable Court enter a declaratory judgment that Canvas's termination of the Agreement was effective as of October 28, 2025, awarding Canvas its costs and reasonable attorneys' fees and provide such other relief as is appropriate.

## AFFIRMATIVE DEFENSES

Defendant Canvas 340, LLC, by and through its counsel, sets out the following defenses to Plaintiff's claims without admitting that it bears the burden of proof on any of them. Further, Canvas reserves the right to amend this list as additional information becomes available:

**AFFIRMATIVE DEFENSE #1:** Plaintiff has failed to state a claim upon which relief may be granted.

**AFFIRMATIVE DEFENSE #2:** Plaintiff may have waived is rights to seek relief due to their own acts or admissions.

**AFFIRMATIVE DEFENSE #3:** Plaintiff's claims for damages may be precluded in whole or in part because Plaintiff failed to mitigate its damages, if any.

**AFFIRMATIVE DEFENSE #4:** Plaintiff's claims may be barred pursuant to the doctrine of estoppel.

**AFFIRMATIVE DEFENSE #5:** Plaintiff's claims may be barred by waiver.

**AFFIRMATIVE DEFENSE #6:** Plaintiff's claims may be barred by the doctrines of unconscionability, oppression and/or unfairness.

**AFFIRMATIVE DEFENSE #7:** Plaintiff's claims may be barred by the doctrine of impossibility.

**AFFIRMATIVE DEFENSE #8:** Plaintiff's claims may be barred as unenforceable as a forfeiture or penalty.

**AFFIRMATIVE DEFENSE #9:** Plaintiff's claims may be barred because they are not ripe.

**AFFIRMATIVE DEFENSE #10:** Plaintiff's claims may be barred because the agreement which form the basis of the Complaint is vague.

**AFFIRMATIVE DEFENSE #11:** Plaintiff's claims may be barred because Plaintiff committed fraud.

**AFFIRMATIVE DEFENSE #12:** Plaintiff's claims may be barred pursuant to the doctrine of unclean hands.

**AFFIRMATIVE DEFENSE #13:** Plaintiff's claims may be barred as they lack mutuality of obligation.

**AFFIRMATIVE DEFENSE #14:** Canvas reserves the right to add or amend its affirmative defenses in this matter in accordance with the Federal Rule of Civil Procedure and this Court's Orders as discovery uncovers additional relevant facts.

**COUNTERCLAIM FOR DECLARATORY JUDGMENT**

Counter-Plaintiff, Canvas 340, LLC, by and through its counsel, for its Counterclaim against Counter-Defendant, Louis Glunz Beer, Inc., states as follows:

1. Canvas 340, LLC ("Canvas") is a United States Virgin Islands limited liability company.

2. Louis Glunz Beer, Inc. ("Glunz") is an Illinois corporation with its principal place of business in Illinois. Glunz is a citizen of Illinois.

3. This Court has subject matter jurisdiction over this Counterclaim under 28 U.S.C. § 1332 because Canvas is a citizen of the U.S. Virgin Islands and Glunz is a citizen of Illinois and, as alleged more specifically below, the amount in controversy exceeds $75,000 exclusive of interest and costs. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 because this Counterclaim arises out of the same set of facts upon which Glunz bases its Complaint and is so related to the claims in Glunz's complaint such that it forms part of the same case or controversy.

4.      This Court has personal jurisdiction over Glunz, and venue is proper in this District, because Canvas brings this action as a counterclaim to the suit filed by Glunz in this District.

5.      Canvas produces and sells, through distributors, WYNK-branded beverages, which are alcohol-free seltzers containing hemp-derived THC and hemp-derived CBD.

6.      Canvas and Glunz entered into a Non-Alcoholic Beverage Exclusive Distribution Agreement, with an effective date of October 20, 2023 (the "Agreement"), through which Glunz agreed to distribute the "Products" within the designated "Territory" in accordance with the terms of the Agreement. A copy of the Agreement is attached to Exhibit A.

7.      Section 5 of the distribution agreement states:

> 5.      **Termination or Failure to Renew Without Good Cause.** Supplier may terminate or fail to renew this Agreement without Good Cause upon sixty (60) days prior notice. In the event that Supplier terminates or fails to renew, this Agreement without Good Cause, then within sixty (60) days of the notice of termination, Supplier shall pay Distributor an amount equal to the fair market value of Distributor's distribution rights which shall not be less than three (3) times Distributor's twelve (12) months trailing gross profit on the sale of the Products sold by Distributor in the Territory (the "Compensation"). If this option is exercised within twelve (12) months of the Effective Date, Supplier shall pay Distributor an amount equal to three (3) times Distributor's average monthly gross profit on the sale of the Products sold by Distributor in the Territory multiplied by twelve (12). Distributor agrees and acknowledges that notwithstanding any other provision of this Agreement, the Compensation was mutually agreed upon. The payment shall be in addition to any amounts payable for inventories under Section 4(e). Provided the Compensation is promptly paid in accordance with this subsection, Distributor agrees that: (i) the Compensation constitutes Distributor's sole compensation of any kind to which it is entitled for the termination of the Agreement by Supplier; and (ii) the Compensation represents full and fair compensation to Distributor for the termination of this Agreement and Distributor's loss of the distribution rights hereunder.

8.      On August 28, 2025, regardless of whether "Good Cause" existed, Canvas provided written notice to Glunz that, [p]ursuant to Section 5 of the Agreement, [Canvas] is exercising its right to terminate the Agreement effective as of October 28, 2025…."

9.      Accordingly, in accordance with Section 5, Canvas's termination was effective as of October 28, 2025.

10. Section 5 further provides that in the event that the Agreement was terminated without asserting "Good Cause," and provided this termination did not occur within the first twelve months of the Agreement, "[Canvas] shall pay [Glunz] an amount equal to the fair market value of [Glunz's] distribution rights which shall not be less than three (3) times [Glunz's] twelve (12) months trailing gross profit on the sale of the Products sold by [Glunz] in the Territory (the 'Compensation')."

11. On September 2, 2025, Glunz responded to the notice of termination, arguing that Canvas owed Glunz a "statutory minimum" payment and that Glunz believed fair market value was "fifteen (15) times trailing twelve-month gross profit."

12. There is no "statutory minimum" payment owed to Glunz.

13. Canvas has paid Glunz an amount equal to three times Glunz's twelve months trailing gross profit on the sale of the "Products" within the "Territory."

14. Through its lawsuit, and as stated in its September 2, 2025, correspondence, Glunz contends that the fair market value due to Glunz under the distribution agreement (*i.e.*, 15x) was greater than the amount Canvas paid Glunz (*i.e.*, 3x).

15. In its lawsuit, Glunz alleges that the distribution agreement "requires Canvas to complete specified conditions precedent—including full [Fair Market Value] payment as determined and paid per the Agreement's terms—before terminating exclusivity or appointing a successor distributor in the Territory." (Compl., ECF No., PageID.7, ¶ 42.)

16. In its lawsuit, Glunz seeks "[p]reliminary and permanent injunctive relief (i) prohibit Canvas from terminating Glunz's exclusivity in the Territory or appointing/selling through a successor [distributor] until the conditions precent are satisfied…." (Compl., ECF No. 1, PageID.12.)

17.     Based on its Complaint, Glunz's position is that Canvas's termination of Glunz was not effective, and remains ineffective, unless and until Canvas pays Glunz the fair market value that Glunz asserts is proper and that, unless and until Canvas pays Glunz the amount that Glunz unilaterally contends is fair market value, Glunz remains Canvas's exclusive distributor.

18.     The difference between the 3x multiple that Canvas paid Glunz, and the 15x multiple that Glunz unilaterally asserts is fair market value, is significantly more than $75,000, reaching into the millions.

19.     As its name implies, Louis Glunz Beer, Inc.'s primary business is that of a beer distributor. Its beer-distribution relationships are, therefore, governed by the Illinois Beer Industry Fair Dealing Act, 815 ILCS 720/1 *et seq.* ("BIFDA").

20.     BIFDA does not govern the Agreement at issue here or the parties' relationship under the Agreement.

21.     BIFDA, however, generally requires that when a supplier terminated a distributor, the supplier must pay "reasonable compensation for the fair market value of the [supplier's] business with relation to the affected brand or brands." 815 ILCS 720/7.

22.     BIFDA further requires that, generally, the distributor has the right to retain its distribution rights for the brands at issue until it receives reasonable compensation for its business with relation to the affected brands.

23.     Glunz's asserted position here, that it is entitled to remain Canvas's exclusive distributor until such time as fair market value is actually determined (unless Canvas agrees to simply pay whatever demand Glunz makes), is an attempt by Glunz to graft BIFDA provisions, which do traditionally govern Glunz's distribution agreements, onto the underlying Agreement here.

24.     The Agreement, however, does not provide that Canvas's right to terminate Glunz is conditioned upon Canvas first paying any amount to Glunz or that Glunz is entitled to retain its rights to distribute any products until such time as it receives fair market value. To the contrary, the Agreement only provides that, after Canvas terminates Glunz, it must compensate Glunz per Section 5.

25.     Canvas's termination of Glunz was effective as of October 28, 2025, and remains effective today.

26.     There is an actual controversy between Canvas and Glunz as to whether Glunz remained and remains Canvas's exclusive distributor, under the Agreement, after October 28, 2025.  Entry of declaratory relief that Canvas's termination was effective as of October 28, 2025, would resolve the controversy.

27.     This Court has the authority to grant declaratory and other relief under 28 U.S.C. §§ 2201 and 2202.

28.     Under Section 23 of the Agreement, Canvas is entitled to its reasonable attorneys' fees, expert witness and court reporter fees, and expenses in bringing this Counterclaim.

WHEREFORE, Counter-Plaintiff, Canvas 340, LLC, prays that this Honorable Court enter a declaratory judgment that Canvas's termination of the Agreement was effective as of October 28, 2025, awarding Canvas its reasonable attorneys' fees, expert witness and court reporter fees, and expenses, and provide such other relief as is appropriate.

Respectfully submitted,
CANVAS 340, LLC

By: /s/ Barry P. Kaltenbach
        One of Its Attorneys

Joseph M. Infante (ARDC 6329000)
infante@millercanfield.com
Barry P. Kaltenbach (ARDC 6270034)
kaltenbach@millercanfield.com
Miller, Canfield, Paddock & Stone, PLC
227 W. Monroe, Suite 3600
Chicago, Illinois 60606
(312) 460-4200

Shauna Barnes
(sbarnes@drinkslaw.com)
Barnes Beverage Group
1910 Town Center Blvd. #250
Annapolis, Maryland 21401
(*admitted pro hac vice*)

# EXHIBIT A

# NON-ALCOHOLIC BEVERAGE
## EXCLUSIVE DISTRIBUTION AGREEMENT

**THIS AGREEMENT** is made and entered into effective October 20, 2023 (the "Effective Date") by and between Louis Glunz Beer, Inc., an Illinois corporation (hereinafter "Distributor"), and Canvas 340, LLC, a U.S. Virgin Islands limited liability company (hereinafter "Supplier").

**WHEREAS,** Supplier is the producer and/or the trademark holder of the brands listed on Schedule A to this Agreement (collectively, the "Products"); and

**WHEREAS,** Supplier desires to appoint Distributor as the exclusive distributor of the Products to the Exclusive Trade Channels in the Territory with a ROFR for the Tobacco Channel in the Territory as such terms are defined in Schedule B to this Agreement (the "Territory").

**NOW, THEREFORE,** in consideration of the mutual promises contained in this Agreement, the parties agree as follows:

1.    **Appointment**. Supplier hereby appoints Distributor as the exclusive distributor of the Products in the Exclusive Trade Channels in the Territory. Supplier shall take reasonable steps, including the discontinuance of sale to infringing resellers, to protect Distributor's exclusivity in the Exclusive Trade Channels in the Territory and to prevent any person other than Distributor from directly or indirectly distributing, selling or marketing the Products in the Exclusive Trade Channels in the Territory. Distributor will not sell Products to any customers outside of the Territory without prior written approval from Supplier. Distributor will not sell any of the Products to any person or entity if Distributor knows, or has reason to know, that the Products will be distributed to retailers outside of the Territory, without written permission from the Supplier.

Supplier shall offer Distributor the right to distribute any new or additional product of Supplier that Supplier desires to introduce into Illinois, and any and all brand or line extensions of the Products that may subsequently be produced by or on behalf of Supplier. Upon acceptance by Distributor, such new products or brand or line extensions shall become Products under this Agreement. If Distributor declines such new products, Supplier may market them in the Territory through a third party only under terms no more favorable to such third party than were offered to Distributor.

2.    **Price and Payment**. Supplier shall sell the Products to Distributor at the prices set forth on Schedule A pursuant to purchase orders provided by Distributor to Supplier. Payment terms shall be net thirty (30) days. Supplier shall give Distributor at least sixty (60) days prior written notice of any price increase for any Product. Supplier will use all commercially reasonable efforts to fill every purchase order placed by Distributor within thirty (30) days following Supplier's receipt of such purchase order. Supplier shall notify Distributor within five (5) days of receipt of any purchase order if Supplier will be unable to ship the ordered Products within thirty (30) days.

3.    **Product Quality**. Supplier shall maintain the premium quality of the Products and comply with all applicable Federal, state and local laws, including, but not limited to, those that may relate to the quality of the Products, labels and containers. All Products delivered to Distributor shall be merchantable and fit for their intended purpose. If defective Products are shipped and received, then Supplier shall reimburse Distributor at the laid-in cost to replace the defective Products. For purposes of this Agreement, "laid-in cost" means the aggregate of: (i) the amount

1



paid by Distributor to Supplier for Products; (ii) Distributor's cost of transporting those Products; and (iii) any taxes and duties paid by Distributor in connection with its purchase of those Products.

4. **Term and Termination.**

(a)     The term of this Agreement shall commence on the Effective Date and shall continue for five (5) years (the "Initial Term"), unless earlier terminated as provided herein. Thereafter, unless written notice is provided to the other party at least sixty (60) days prior to the expiration of the Initial Term or any Renewal Term (as defined herein), this Agreement shall be automatically renewed following the expiration of the Initial Term or Renewal Term for successive five (5) year periods (each a "Renewal Term" and the Initial Term and all Renewal Terms collectively, the "Term").

(b)     Distributor may terminate this Agreement upon sixty (60) days' prior written notice to Supplier.

(c)     Supplier may terminate or refuse to renew this Agreement for "Good Cause" upon sixty (60) days' advance written notice, provided Distributor fails to cure within such sixty (60) day period as provided below. "Good Cause" shall mean the failure to comply substantially with the material requirements of this Agreement, if the requirements are not discriminatory as compared with requirements imposed on other similarly suited wholesalers either by their terms or in the manner of their enforcement. If Distributor fails to substantially cure the default to Supplier's reasonable satisfaction, Supplier may terminate or not renew the Agreement without incurring any liability whatsoever. If Distributor substantially cures within the cure period to Supplier's reasonable satisfaction, then the notice of termination or non-renewal shall be void and of no effect, and the Agreement shall remain in force.

(d)     Supplier may immediately terminate this Agreement for cause by giving written notice of termination to Distributor in the event that (a) Distributor fails to timely pay any undisputed amount due to Supplier within ten (10) days after receipt of written notice of any amount past due, (b) Distributor or any of its principals is convicted of, or pleads guilty to, any felony which materially and adversely affects the ability of Distributor to distribute and sell the Products in the Territory or materially reflects adversely upon Distributor's or the Products' image in the Territory in the sole reasonable opinion of the Supplier; (c) Distributor makes an assignment for the benefit of creditors; (e) Distributor becomes insolvent; (d) Distributor has commenced, or has an order of relief entered  against it in, any proceeding under any bankruptcy, insolvency, reorganization or similar laws; (e) there is a liquidation or dissolution of Distributor's business; (f) Distributor has any license necessary to carry out its business revoked or suspended for a period of more than seven (7) days; or (g) Distributor undertakes a change in ownership or effects an assignment that does not meet the requirements of Section 16.

(e)     Upon termination of this Agreement, Supplier or its designee shall purchase from Distributor, at Distributor's laid-in cost for the Products, all of its Products and paid-for point of sales materials. Distributor agrees, at Supplier's request, to ship any of the inventory being purchased at the purchaser's direction, F.O.B. Distributor's place of business.

(f)     Upon termination of this Agreement, all outstanding and unfulfilled purchase orders will be cancelled.

(g)     Upon termination of this Agreement, any amounts owing to a party by the other party shall accelerate and become immediately payable.

2



5. **Termination or Failure to Renew Without Good Cause**. Supplier may terminate or fail to renew this Agreement without Good Cause upon sixty (60) days prior notice. In the event that Supplier terminates or fails to renew, this Agreement without Good Cause, then within sixty (60) days of the notice of termination, Supplier shall pay Distributor an amount equal to the fair market value of Distributor's distribution rights which shall not be less than three (3) times Distributor's twelve (12) months trailing gross profit on the sale of the Products sold by Distributor in the Territory (the "Compensation"). If this option is exercised within twelve (12) months of the Effective Date, Supplier shall pay Distributor an amount equal to three (3) times Distributor's average monthly gross profit on the sale of the Products sold by Distributor in the Territory multiplied by twelve (12). Distributor agrees and acknowledges that notwithstanding any other provision of this Agreement, the Compensation was mutually agreed upon. The payment shall be in addition to any amounts payable for inventories under Section 4(e). Provided the Compensation is promptly paid in accordance with this subsection, Distributor agrees that: (i) the Compensation constitutes Distributor's sole compensation of any kind to which it is entitled for the termination of the Agreement by Supplier; and (ii) the Compensation represents full and fair compensation to Distributor for the termination of this Agreement and Distributor's loss of the distribution rights hereunder.

6. **Duties of Distributor**.

(a) <u>Sales Efforts and Promotion Allowance</u>. Distributor agrees to use its commercially reasonably efforts to sell and actively promote in a lawful manner the sale of the Products in the Exclusive Trade Channels in the Territory.

(b) <u>Facilities and Sales Force</u>. Distributor shall maintain a properly trained sales force of adequate size to represent and promote the sale of the Products in the Exclusive Trade Channels throughout the Territory, provided that nothing contained herein shall obligate Distributor to increase the size of its present sales force, which Supplier acknowledges shall be adequate for all purposes of this Agreement.

(c) <u>Area of Sales</u>. Distributor agrees that it will not sell the Products directly or indirectly to customers located outside of the Territory or as otherwise set forth in Section 1 without the prior written approval of Supplier.

(d) <u>Handling and Store of Products</u>. Distributor shall at all times comply with the reasonable good manufacturing practices that Supplier informs Distributor of together with all applicable laws, rules and regulations regarding the handling and storage of the Products. Distributor shall take all reasonable steps to ensure that the Products are stored under conditions sufficient to maintain the quality and taste of the Products and shall not promote the sale or consumption of Products beyond their "best consumed by" date. Distributor shall be responsible for any damages to the Products arising from the Distributor's mis-handling or improper storage thereof.

(e) Distributor acknowledges and agrees that Supplier is and shall remain the exclusive owner of intellectual property including: (a) all recipes, formulations and any modifications or improvements thereto, specifications, Marks (as such term is hereinafter defined) and associated goodwill, domain names and websites (and their content) that include the Marks, original copyrightable subject matter and any derivative works, including, but not limited to, artwork, graphics, and label copy furnished by, or developed for, Supplier, and other confidential and

3



proprietary information developed by or for Supplier; and (b) any inventions, discoveries or improvements by Supplier, whether or not patentable including, without limitation, manufacturing processing techniques and, equipment, methods and designs for packaging, dispensing or storing of the Products. "Marks" shall mean the trademarks, service marks, trade dress and trade names listed on Schedule C attached hereto and such other trademarks, service marks, trade dress and trade names and all associated good will, as may be added to such schedule from time to time by Supplier.

7. **Duties of Supplier.**

(a)     Sale of Products. Supplier shall sell the Products to Distributor pursuant to the terms of this Agreement and Supplier will take all reasonably necessary steps to ensure that no other person sells or distributes the Products to the Exclusive Trade Channels in the Territory.

(b)     Shipping. Supplier will use commercially reasonable efforts to prepare the Products for pickup or to make prompt shipments of the Products to Distributor in accordance with Distributor's purchase orders for the Products F.O.B. Distributor's loading dock.

(c)     Apportionment of Products. In times of short supply of the Products, Supplier will use reasonable efforts to allocate the Products fairly and equitably among its distributors, such that Distributor will be allocated a percentage of its requirements for the Products commensurate with its reasonably projected sales volume as compared to all other distributors. In any such case, Supplier shall provide Distributor prompt written notice of the affected Products and shall make all reasonable efforts to rectify such shortage.

(d)     Brand Marketing.  Supplier will:

(i)     develop and implement brand strategies for the Products with assistance from Distributor;

(ii)     develop marketing strategies, programs and activities with respect to the Products, furnish such information to Distributor and provide Distributor with pricing information, sales material and technical assistance, as needed; and

(iii)     develop sales, merchandising and promotional material to support Product development and assist Distributor in promoting sales of the Product.

8.     **Joint Responsibilities.**

(a)     POS. Distributor and Supplier shall each pay and be responsible for fifty percent (50%) of the  cost of mutually-agreeable point of sales materials, events, activations and sponsorships to promote the Products in the Territory.

(b)     Samples.  Distributor is authorized to provide samples of the Products to retailers in the Territory in reasonable quantities. Distributor and Supplier shall each pay and be responsible for fifty percent (50%) of the cost of samples.

(c)     Coded Product. Distributor and Supplier shall each pay and be responsible for fifty percent (50%) of the laid-in cost of all Products, whether in the market or at Distributor's



warehouse, that reach the date by which Supplier requires its Products to be removed from the retail trade.

(d)     Confidentiality. Each party acknowledges and agrees that, during the Term and for period of one (1) year thereafter, the non-disclosing party shall (i) protect the Confidential Information (as such term is hereinafter defined) of the disclosing party with at least the same degree of care as the non-disclosing party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care, and (ii) not disclose, copy, download or use for the direct or indirect benefit of any third party any Confidential Information.  The term "Confidential Information" shall mean trade secrets, product innovations, and business plans, sales reports, customer lists, depletion reports and other sales related data.  Confidential Information shall not include information that (A) is or becomes part of the public domain through no act or omission attributable to the non-disclosing party; (B) is or becomes available to the non-disclosing party from an independent source without breach of any confidentiality obligations owed to the disclosing party; (C) was lawfully in possession of, developed by, or known by the non-disclosing party prior to receiving it from the disclosing party; (D) is released after prior written authorization by the disclosing Party; or (v) is required by law, to be disclosed; provided, however, that, if disclosure is required by law, the non-disclosing Party shall provide the disclosing Party with prompt notice of such requirement so that the disclosing Party may seek protection of the Confidential Information.

9.     **Representations and Warranties.**

(a)     Supplier represents and warrants that:

(i)     Supplier holds all necessary Federal, state and local licenses and permits to manufacture the Products and to sell the Products to Distributor pursuant to the terms and conditions of this Agreement;

(ii)     Supplier has all corporate authority to perform its obligations arising pursuant to this Agreement, and compliance with the terms of this Agreement will not conflict with or violate any other agreement or understanding to which Supplier is a party or is bound;

(iii)     Supplier owns all intellectual property rights relating to the Products, including all trademarks, copyrights and trade names necessary for the sale of the Products, and the use of such intellectual property in connection with the sale of the Products by Distributor;

(iv)     All Products delivered to Distributor shall, upon delivery, (A) be merchantable premium products of good quality, in first class condition and produced in accordance with Supplier's specifications; (B) be free of defects in content and workmanship; (C) be fit for their intended purposes; (D) be fit for human consumption; (E) not be impure, contaminated or adulterated, misbranded or mislabeled within the meaning of the Federal Food, Drug and Cosmetic Act, as amended, the Food Additives Amendment of 1968 or any applicable state or local food or beverage law, or an article which may not be introduced into interstate commerce; (F) comply with all applicable Federal, state and local laws; (G) be free and clear of all liens, and (H) have remaining at least seventy-five percent (75%) of the Products' full shelf life as of the date of delivery;

(v)     Supplier has adequate capacity to meet the anticipated volume needs of

5



Distributor (as well as the needs of all other parties to which Supplier has or will grant distribution rights outside the Exclusive Trade Channels in the Territory); and

(vi)     Supplier shall exercise its commercially reasonable efforts to fulfill every purchase order placed by Distributor for Products within thirty (30) days following Supplier's receipt of such order by Distributor.

(vii)     The Products contain hemp and do not contain delta-9 tetrahydrocannabinol (THC) concentration of not more than 0.3% on a dry weight basis. Further, Supplier shall not: (a) make any health claims; (b) produce or manufacture the product in interstate commerce without proper authorization and the right to do so; (c), mislabel the Products; (d) include any ingredients which do not comply with applicable law;

(viii)     The hemp contained in the product is from a licensed facility, permitted, or lawfully compliant facility, or is otherwise lawfully in the State of Illinois and for each Product sold to Distributor Supplier has a certificate of analysis; and

(ix)     Supplier waives any and all claims that in addition to any CBD based products, any other products, alcoholic or non-alcoholic, which Distributor distributes or chooses to distribute in the future, shall form the basis to terminate this Agreement.

(b)     Distributor represents and warrants that:

(i)     Distributor holds all necessary state licenses and permits to sell and distribute the Products in the Territory;

(ii)     Distributor has all corporate authority to perform its obligations arising under this Agreement and compliance with the terms of this Agreement will not conflict with or violate any other agreement to which Distributor is bound;

(iii)     Distributor shall comply with all reasonable instructions and requirements provided by Supplier concerning the handling, storage, transport, and use of the Products and any labeling, warnings, or documentation provided by Supplier shall not be removed, destroyed, or altered, and shall be provided to consumers by Distributor in the form provided by Supplier;

(iv)     Without the prior written consent of Supplier, Distributor shall not make any representations or warranties to any customer, potential customer or other person or entity concerning the Products which differ from, or are in addition to or more extensive than, the representations and warranties with respect to the Products included in this Agreement. Supplier's representations and warranties shall not apply to any Products which, after delivery and acceptance by Distributor at the facility, have been subjected to negligence, accident, improper storage, contamination, or otherwise altered; and

(v)     Without the prior written consent of Supplier, Distributor shall not in any way (A) alter any of the Products or any part thereof for subsequent sale or use without the prior written consent of Supplier, or (B) repackage or modify the packaging of the Products delivered by Supplier to Distributor.

6



10. **Insurance.** Supplier shall at all times have in full force and effect general and products liability insurance with a combined single limit of not less than $2 million per occurrence and $5 million in the in the aggregate on account of any accident, event or occurrence resulting in bodily injury, personal injury, death or property damage caused, or alleged to have been caused, by the Products or their packaging or the negligence of Supplier. Said policies shall cover any potential or actual liability arising out of product liability claims and actual or alleged negligence of Supplier and shall survive termination of this Agreement. Supplier shall provide Distributor with a certificate of said insurance coverage, and said certificate shall expressly state that coverage provided for therein shall not be cancelled unless and until the giving to Distributor of thirty (30) days prior written notice. Supplier shall name Distributor as an additional insured on said policy or policies.

Distributor shall at all times have in full force and effect, workers' compensation and commercial general liability insurance with a combined single limit of not less than $2 million per occurrence and $5 million in the in the aggregate and as may be required under laws applicable in the Territory. Distributor shall provide Supplier with a certificate of said insurance coverage, and said certificate shall expressly state that coverage provided for therein shall not be cancelled unless and until the giving to Supplier of thirty (30) days prior written notice.

11. **Product Recall or Regulatory Change.** Supplier shall promptly notify Distributor of any recall, shall reimburse Distributor for any recalled Product (at Distributor's laid-in-cost), and shall compensate Distributor for any costs incurred to remove Products from and replace Products at retail locations.

(a) <u>Response to regulatory changes</u>. Should prevailing laws change such that the sale of Supplier's product is no longer legal in Distributor's market the Supplier shall reimburse Distributor for all such Products (at Distributor's laid-in-cost) and shall compensate Distributor for any costs incurred to remove Products from or replace Products at retail locations.

12. **Indemnification.** Each party shall indemnify, defend and hold harmless the other party, and their respective directors, officers, shareholders and employees, from and against any and all claims, suits, judgments, losses, expenses, costs of investigation, damages and liabilities (including reasonable attorneys', expert witness and court reporter fees and expenses) arising out of or relating to: (a) any damage to any person or property which was caused, or which is alleged to have been caused, in whole or in part, by its negligent or intentional conduct, performance of its obligations herein, or failure to perform its obligations herein; (b) any claims by governmental authorities with respect to its non-compliance with laws, rules and regulations applicable to the transactions addressed herein; and (c) any breach of any of its covenants, representations and warranties herein.

In addition, Supplier shall indemnify, defend and hold harmless Distributor and its directors, officers, shareholders and employees, from and against any and all claims, suits, judgments, losses, expenses, costs of investigation, damages and liabilities (including reasonable attorneys', expert witness and court reporter fees and expenses) arising out of or relating to (a) any claim or action by any current or former distributor of any of the Products that in any way arise out of or relate to the right to distribute any or all of the Products; and (b) any actual or claimed infringement of any Marks or proprietary rights by reason of the Products or any advertising or promotional materials created, supplied or approved by Supplier. In the event of any infringement or claimed infringement of any Marks or proprietary rights by reason of the Products or any advertising or promotional materials, Supplier, at its option and expense may:

7



(a) Secure for Distributor the right to continue selling or distributing the Products, either by obtaining a license for such continued sale or distribution or by other appropriate means;

(b) Promptly replace the Products with non-infringing products;

(c) Promptly modify the Products so as to render them non-infringing; or

(d) Promptly remove the Products from Distributor's premises and refund the laid-in cost of the Products plus the reasonable employee and handling costs associated with the removal within fifteen (15) days of removal.

13. **Force Majeure**. Fires, floods, wars, acts of war, pandemics, epidemics, strikes, lockouts, labor disputes, accidents to machinery, delays or defaults of common carriers, orders, decrees or judgments of any court, or any other contingency beyond the control of Supplier or Distributor, whether related or unrelated, or similar or dissimilar to any of the foregoing, will be sufficient excuse for any resulting delay or failure in the performance by either party of its respective obligations under the Agreement, but such performance will be excused only as long as the *force majeure* continues.

14. **Relationship of the Parties**. The relationship between the Parties is that of independent contracting parties, as buyer and seller of goods, and not that of partners, joint ventures, or principal and agent. Neither party has or will hold itself out as having the authority to bind or act in the name of, or on behalf of, the other.

15. **Notices**. Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given when received, or refused, as the case may be (i) upon personal delivery, (ii) after delivery by Federal Express or other national overnight courier, or (iii) after mailing by certified or registered United States mail, return receipt requested, postage prepaid, and in each case with the addresses set forth below:

Notice to Distributor shall be sent to:

Louis Glunz Beer, Inc.
7100 N. Capitol Dr.
Lincolnwood, IL 60712
Attn: Jerry Glunz

With a copy to:

Tucker Ellis LLP
233 S. Wacker Drive, Suite 6950
Chicago, IL 60606
Attn: Ashley Brandt

Notice to Supplier shall be sent to:

Canvas 340, LLC

8



6501 Red Hook Plaza, Suite 201
St. Thomas, VI 00802
Attn: Angus Rittenburg

16. **Assignment.** Distributor may not assign any rights or obligations under this Agreement without the prior written approval of Supplier, except such approval need not be obtained prior to: (a) a change in the record or beneficial ownership of Distributor's outstanding equity to any current owner of such interest or to any affiliate of such owner; (b) a change in the record or beneficial ownership of Distributor's outstanding equity that does not result in a change of operational control of Distributor; (c) the sale, transfer or other similar transaction resulting in a disposition of all or substantially all of the assets or stock of the company to a different company owned at least fifty percent (50%) by any one of Distributor's current equity holders, or (iv) the sale, transfer, or disposition of any ownership interest upon the death of an owner of Distributor directly to, or for the sole benefit of, the deceased owner's spouse, parent, brother, sister, or adult child or adult grandchild who is entitled to inherit the deceased owner's ownership interest under the terms of the deceased owner's will or the laws of intestate succession.

17. **Binding on Successors.** This Agreement will bind and inure to the benefit of the Parties and their permitted and respective legal representative, successors, and assigns. However, nothing in this Agreement shall confer any benefits, rights, or remedies upon any person or entity not a party hereto.

18. **Enforcement.** Except to the extent provided in this Agreement the failure of either party to enforce at any time any right or remedy it may have under this Agreement will not be a waiver of the provision or right, and will not preclude or prejudice the party from thereafter exercising the same or any other right or remedy it may have under this Agreement.

19. **Severability.** If any provision of this Agreement is held invalid, for any reason by a court, government agency, body or tribunal, the remaining provisions will be unaffected and will remain in effect unless the invalidity goes to the essence of the Agreement.

20. **Amendment.** No change, modification, or alteration to this Agreement, or to the distribution relationship evidenced hereby, excepting as provided herein, will be effective unless set forth in writing and signed by both Parties.

21. **Entire Agreement.** This Agreement supersedes all previous and contemporaneous agreements and understandings between the Parties and is intended as the complete and exclusive statement of the terms of their understanding and agreement with respect to the subject matter hereof. There are no representations, oral or written, upon which Supplier or Distributor has relied as an inducement to enter into this Agreement, other than those set forth herein.

22. **Forum.** Supplier and Distributor irrevocably agree that all actions or proceedings in any way or respect, arising out of or from or related to this Agreement shall be litigated in courts having situs within Cook County, Illinois. Supplier and Distributor hereby consent to the exclusive jurisdiction and venue of any local, state or federal court located within said county and state and waive any objection they may have based on improper venue or forum non conveniens to the conduct of any proceeding hereunder.

23. **Attorney's Fees.** If either party brings an action to enforce or interpret this



9

Agreement, the more prevailing party in any such action (including a party that has successfully defended against a claim asserted against it by the other party) shall be entitled to recover reasonable attorneys', expert witness and court reporter fees, costs, and expenses from the less prevailing party.

24.      **Construction.** The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against either party. The section headings are for are intended as aids in construction and shall not affect the interpretation of any provision.

25.      **Anti-Harassment Policies.** The Supplier acknowledges that it read the Distributor's anti-harassment policy, which may be amended from time to time, and the Supplier has anti-harassment policies consistent with the Distributor's anti-harassment policy. The Supplier shall provide the Distributor a copy of the Supplier's anti-harassment policies upon request. The Supplier shall pay the Distributor any damages the Distributor sustains for any violation of this Section X by the Supplier, including loss of retailer sales and goodwill.

26.      **Counterparts.** This Agreement may be executed in multiple counterparts with detachable signature pages, which may be exchanged electronically, and each of which will be deemed an original, and when taken together shall form a single agreement. A copy of this Agreement or of a signature thereto shall have the same force and effect as the original.

**[THE SIGNATURE PAGE APPEARS IMMEDIATELY HEREAFTER.]**



10

     **IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date, set forth hereinabove.

**LOUIS GLUNZ BEER, INC.**                     **CANVAS 340, LLC**

By: _Jane Delaney_                                 By: _Angus Rittenburg_

Name: Jane Delaney                               Name: Angus Rittenburg

Title:  Owner - Manager r                         Title: Co-Founder

11



## SCHEDULE A

**Products**:

Wynk™-branded 7.5 oz canned seltzers with 2.5 mg of hemp-derived THC per can and 2.5 mg of hemp-derived CBD per can.

Wynk™ branded 12 oz canned seltzers infused with 5 mg of hemp-derived THC per can and 5 mg of hemp-derived CBD per can.

This list of Products may be updated only through mutual written agreement of the Parties.

**Pricing**:

The pricing for the Products shall be added by addendum to this Agreement.



## SCHEDULE B

"Exclusive Trade Channels" means the following located in the Territory:

1.      All on-premise accounts (including by way of example and not limitation, bars, restaurants, casinos, hotels, sports venues, etc.) in the Territory licensed to sell alcoholic beverages, except as otherwise indicated in this Exhibit as an Excluded Trade Channel or where prohibited by law; and

2.      All off-premise accounts in the Territory (including by way of example and not limitation, convenience, grocery, chain, lodging, recreational, national accounts, warehouse, and club stores) licensed to sell alcoholic beverages, except as otherwise designated in this Exhibit as an Excluded Trade Channel or where prohibited by law.

"Excluded Trade Channels" means dispensaries, direct-to-consumer (i.e., the parties acknowledge that on- and off-premise retailers in the Exclusive Trade Channels may sell online direct to consumers, however, this shall not effect or restrain Supplier's ability to sell direct-to-consumer), and health and wellness store channels in the Territory.

Distributor shall have a right of first refusal ("ROFR") in the Territory for the Tobacco Channel if Distributor can satisfactorily demonstrate to Supplier that Distributor can adequately service seventy-five percent (75%) of this channel. The "Tobacco Channel" means the licensed tobacco retailers in the Territory that do not have retail alcohol licenses.

"Territory" means the Counties of Cook, Lake, McHenry DeKalb, Kane, DuPage, Kendall, and Will in the State of Illinois.

13



## <u>SCHEDULE C</u>

The current Marks are:

1. WYNK™

2. Wynk™ logo

3. Wherehouse™

4. Wherehouse™ logo

14

