**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **LOUIS GLUNZ BEER, INC.,** | |
| **Plaintiff,** | |
| **vs.** | **Case No. 26-CV-1124** |
| **CANVAS 340, LLC,** | |
| **Defendant.** | |

**DEFENDANT CANVAS 340, LLC's
REPLY TO PLAINTIFF LOUIS GLUNZ BEER, INC.'s
<u>OPPOSITION TO MOTION TO DISMISS</u>**

Plaintiff Louis Glunz Beer, Inc.'s ("Glunz") Response to Defendant Canvas 340, LLC's

Motion to Dismiss ("Response") confirms that Glunz is unable to plausibly plead the identification

of trade secret information and has not properly alleged misappropriation. Although the Court must

accept well-pleaded facts as true, Glunz fails to meet its pleading obligations. Accordingly, Glunz's

Second and Third Causes of Action should be dismissed. Glunz concedes that its Fourth Cause of

Action for unjust enrichment should be dismissed.

**<u>INTRODUCTION</u>**

Glunz fails to plausibly allege the existence of protectable trade secrets, the

misappropriation of protected trade secrets, or the existence of independent economic damages

arising from an improper use of the information during the parties' business relationship or after

the relationship ended. Glunz's Response overstates the pleading standard for trade secret claims

by suggesting that obvious factual deficiencies must be resolved by the factfinder rather than

addressed at the pleading stage. Had Glunz alleged more than broad categories of industry, sales

and general business information, its argument might carry weight. Instead, like the Complaint, the Response fails to identify any protectable trade secrets with the requisite specificity, any misappropriation, or any fact supporting the information's independent economic value to the plaintiff. Although Glunz now invokes the concept of protectable "compilations" to claim trade secret protection of data, no such compilations were alleged in the Complaint. Recasting broad, vague, and readily ascertainable data as a trade secret is insufficient where the pleading lacks the detail necessary to support the claim.

Glunz does not plead facts showing misuse of protected data, whether during or after the Agreement's term. Whether the data was created "by or for" Canvas, it is owned by Canvas and may be used during the Agreement in accordance with the terms and restrictions contained therein. Yet, Glunz has not plausibly alleged misuse of the information prior to termination. Any allegation of misappropriation of the information after the Agreement ends must also fail as a matter of law because by that point, Glunz has no recognizable economic interest in the information once the Agreement is over.

No legally binding restriction prohibits Canvas's fair use of the information after termination. Indeed, on its face, this is the only reasonable conclusion: Glunz is merely one of Canvas's many distributors, and the only rights conferred to Glunz were the contractual distributorship rights permitted under the Agreement. Those rights ended upon termination, and Canvas is the rightful owner of that information. Ultimately, while Glunz may be upset about the termination of the Agreement, the trade secret claims are an attempt to recover unwarranted damages outside of the parties' contractual rights and should be dismissed.

## ARGUMENT

**I.        Glunz Fails to Properly Plead the Existence or Identification of Protectable Trade Secrets.**

Glunz's Response emphasizes the measures it undertook to fulfill its obligations under the October 23, 2023 Distribution Agreement ("Agreement"), including its efforts to store and protect information exchanged during the term, which both parties used to grow Canvas. Glunz describes the information in the Complaint by breaking it into vaguely defined categories of data and information that it says was generated in furtherance of the Canvas/Glunz supplier-distributor relationship. (Plaintiff's Response at pp. 2-4, ECF No. 22., PageID.112-14.)   These same protections restricting misuse were already in place by virtue of the Agreement's terms, and Glunz's alleged misappropriation of the information is really a contract claim dressed up as a trade secrets claim.

The Complaint states that Canvas accessed confidential information during the term of the Agreement and used, intends to use, or may one day in the future use that information against Glunz's economic interests, even if well after the contractual relationship ended.  (Complaint ¶¶ 29-30, ECF No. 1, PageID.6.)  Glunz alleges harm based on the future use of the information by Canvas's distributors, who may one day choose to compete with Glunz following the termination of the Agreement.  (Response at pp. 4-5.)  If Glunz contends that confidential information was improperly disclosed during the term of the Agreement, its remedy lies in its claim for breach of contract. If the improper use is alleged to have occurred after the Agreement concluded, that claim would also be legally deficient as a trade secret claim, because Glunz would have no independent economic value in the information, as it could no longer lawfully distribute Canvas products within the territory. Therefore, no trade secret misappropriation could occur. Neither Canvas nor its distributors will *ever* compete with Glunz in the sale of Canvas products in the territory post-

3

Agreement, rendering any of the allegedly protected information commercially worthless to Glunz following termination.

Glunz's position disregards the plain language of the Agreement and, if accepted, it could indefinitely prevent Canvas from expanding its business in the region beyond the parties' relationship, or from using its own data, regardless of how that data was created, maintained, or owned.

**II.      Glunz Fails to Properly Apply the Standard of Review**

Glunz would have the Court find that any deficiency in its pleadings, or failure to satisfy the plausibility standard, means "these are all fact issues for another day," because Glunz's factual allegations must be taken as true.  (Response at p. 10.)  That is incorrect.

Glunz correctly notes that courts have observed that trade secret claims are "ordinarily" better resolved by the factfinder after development of an evidentiary record, and that generalized descriptions may suffice at the pleading stage when supported by sufficient factual context regarding the alleged confidential information and the defendant's access to it.  *See, e.g., RVassets Ltd. v. Marex Cap. Mkts. Inc.*, Case No. 23-c-14192, 2024 WL 1928692, at *5 (N.D. Ill. May 2, 2024).  However, where a plaintiff fails to plausibly allege the existence of a protectable trade secret, improper use or disclosure by the defendant, or a cognizable injury independent of a breach of contract claim, courts in this District will dismiss trade secret claims at the pleading stage.  *See Cozzini Bros., Inc. v. Cozzini Cutting Supplies, LLC,* No. 25-cv-9444, 2026 WL 710853, at *4 (N.D. Ill. Mar. 13, 2026) ("nowhere does the complaint adequately and specifically describe what the trade secret information is comprised of").

The categories of information identified in Glunz's Complaint encompass a broad array of business information that may confer value on suppliers and distributors, but it also includes

allegations related to the types of non-confidential information routinely exchanged between manufacturers and distributors in the ordinary course of a distributorship relationship. When the list of information clearly intertwines some information that may be protectable with information that clearly is not, the task of parsing through the categories to determine which information is actually protectable as a trade secret should not fall to the defendant or this Court. Contrary to Glunz's Response, this distinction does not create a factual issue for discovery; rather, it is a question of whether Glunz's Complaint provides enough detail to identify which information Glunz contends constitutes a legally protectable trade secret.

The Northern District of Illinois treats customer and pricing information like that at issue here with skepticism at the pleading stage, dismissing trade secret claims where the alleged facts are not plausibly pled to support them. Where the customer and pricing information has not been curated to create its own independent economic value, it does not give rise to an identifiable trade secret. Recently, a court in this District entered a dismissal when it observed that the business information disclosed to customers, or known within the industry, did not qualify for statutory protection. *See Cozzini Bros.*, 2026 WL 710853, at \*4-5. There, the Plaintiff, in response to the motion to dismiss, argued that "its pricing and product purchasing information for specific customers may constitute trade secrets," but the Court observed that the complaint did not adequately and specifically describe what the trade secret information comprised. *Id*. at \*4. *Cozzini* identifies two recurring grounds for dismissal in trade-secret pleadings: first, disclosed pricing is difficult to characterize as secret; and second, vague allegations regarding customer and pricing information will not survive if the plaintiff fails to define the alleged secret with sufficient specificity. It stands to reason that other elements of a trade secret claim must also meet these minimum expectations to withstand scrutiny at the pleadings level.

While not a pleading stage case, *Del Monte Fresh v. Chiquita Brands International*, 616 F. Supp. 2d 805, 819-22 (N.D. Ill. Mar. 19, 2009), is also relevant here as the court held that vague allegations about customer and pricing information will not survive if the plaintiff does not define the alleged secret precisely. The court held that alleged trade secrets consisting of pricing, customer requirements, customer identities, and contact information were not protectable trade secrets under the alleged facts. *Id.*; s*ee also Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005) (approving dismissal where customer identities were not trade secrets because they were widely known and not kept confidential); *Computer Care v. Serv. Systems Enters., Inc.*, 982 F.2d 1064, 1075 (7th Cir. 1992) (affirming dismissal of the complaint where proprietary methods and pricing-related practices were not secret because they reflected general industry knowledge or could be readily duplicated).

Additionally, many of the cases on which Glunz relies predate *Ashcroft v. Iqbal*, after which the standard for assessing well-pleaded facts and facial plausibility materially changed. *See* 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Glunz's partial reliance on older case law, rather than the more recent, commonsense pleading standards applied post-*Ashcroft v. Iqbal*, runs counter to the pragmatic approach courts in the Seventh Circuit apply when assessing trade secret claims. The pleadings must be plausibly pled or risk dismissal on a motion to dismiss.

### III.  Glunz Fails to Plausibly Allege Identifiable Trade Secrets

The Complaint struggles to distinguish properly designated confidential or trade secret information from information that may be customer-owned, manufacturer-known, publicly known, or readily ascertainable in the market. The Response continues that struggle by asserting

6

ownership rights and protection of broad categories of business information without plausibly pleading the existence of protectable secrets, an independent economic value based on the secrecy of that information, or a plausible, fact-specific misappropriation of the shared information Canvas was permitted to access. (Response at pp. 8-9.) The Complaint's obvious mixture of protected information versus ordinary, non-confidential information subjects the trade secret claims to scrutiny. It is the plaintiff's burden to identify and distinguish the alleged trade secrets—a task it did not or could not perform.

Glunz attempts to salvage its trade secret claims by asserting that during the Agreement it transformed voluminous data into protected, non-public compilations that confer a competitive advantage (Response at p. 11). However, a closer review of the Complaint—particularly Paragraph 20—shows that Glunz does not allege any protectable "compilation" but rather voluminous information ("granular account-specific data") that does not constitute a compilation (Response at pp. 8-9). Categories of voluminous information are the opposite of a "compilation" and undermine the claims of trade secret protection.

The core inquiry is secrecy, not labels. Courts repeatedly reject claims based on generalized customer information, pricing, service history, and market know-how when the plaintiff fails to plead concrete secrets, explain why the information is not readily ascertainable, link secrecy to economic value, or allege reasonable measures to maintain confidentiality. *See* 765 ILCS 1065/2; *ILG Industries, Inc. v. Scott*, 273 N.E.2d 393, 396-97 (Ill. 1971); *System Development Servs. v. Haarmann*, 907 N.E.2d 63, 73 (Ill. App. Ct. 2009). Rather, such information is protectable only when it reflects sustained investment, is not readily compiled from public or customer sources, and is closely guarded. *See Label Printers v. Pflug*, 564 N.E.2d 1382, 1389 (Ill. App. Ct. 1991); *Off. Mates 5, N. Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1083-84 (Ill. App. Ct.

7

1992); *Hamer Holding Grp., Inc. v. Elmore*, 560 N.E.2d 907, 918-19 (Ill. App. Ct. 1990). Glunz does not meet this standard.

### IV. There Is No Independent Economic Value in the Information Glunz Asserts Are Trade Secrets

To survive the Motion to Dismiss, Glunz must allege that the information has independent economic value to Glunz. *See* 765 ILCS 1065/2. Once the Agreement ends, Glunz has no independent economic interest in the information, as the rights to use it are granted under the (then terminated) Agreement—the Agreement has ended and Glunz is no longer permitted to use the information. Canvas's use of the information following the termination of the Agreement, however, was specifically planned and agreed upon. Once the Agreement was terminated, and the relationship was over, the compensation identified in the Agreement is the full extent of the compensation owed to Glunz. Accordingly, the information has no independent economic value to Glunz following termination of the Agreement and cannot support its trade secret claims.

### V. Glunz Fails to Plausibly Plead Misappropriation

The Response mischaracterizes Canvas's position on trade secret misappropriation. Glunz admits that Canvas accessed the information with permission and pursuant to the Agreement and does not allege that Canvas accessed or used any other supplier's information. (Response at p. 3.) Indeed, Glunz concedes that the alleged "misappropriation" turns solely on what Canvas purportedly did with the information and whether that conduct constituted misuse rising to the level of misappropriation under the ITSA or DTSA. (Response at pp. 13-15.)

Because Canvas rightfully accessed the information before the termination of the Agreement (see Complaint ¶¶ 19, 22), Glunz must plausibly plead the second prong: that Canvas had improperly used its own information, accessed with permission, to (a) improperly support new distributor partners (b) improperly capitalize on the information Glunz alleges it spent years

8

developing.  (Response at pp. 4-5.)  Glunz's Response fails to mention that it was compensated for all the work it agreed to perform under the Agreement, and it omits the fact that it negotiated and agreed to the terms of the Agreement that grant Canvas exclusive ownership of this information. (Response at p. 4.) Other than the contract dispute that gives rise to the first cause of action, Glunz has been compensated appropriately and there is no plausible allegation of misappropriation.

The Agreement did not have a minimum term and allowed for termination with just 60 days' notice, sent by either party.  (Complaint ¶¶ 25-30.) When it signed the Agreement, Glunz indicated its understanding that Canvas could continue its operations post-termination, use its information in the ordinary course of its business, and obtain a new distributor for its products after the termination of the Agreement.

> A. <u>The Confidential Information and Trade Secrets Described in the Response Were All Created By, Or For, Canvas and Belong to Canvas.</u>

Glunz's Response goes to great lengths to describe the distribution, sales, and marketing efforts undertaken by the parties to launch, sell, and promote Canvas's WYNK-branded products in Illinois.  (Response at p. 2.)  Glunz argues that Canvas had no prior presence in Illinois and that establishing a distribution strategy created obligations that required Glunz to invest considerable time, money, and effort introducing the brand to Chicago and distributing to retailers in the area. *Id.*  Glunz does not use its Response to provide any additional clarification regarding the trade secrets it claims, insisting ordinary business information constitutes protected trade secrets. Yet ultimately, that lack of detail may be of little importance to resolving Canvas's Motion.

The Response focuses on the information Glunz claims it created to support the parties' relationship, shared during that relationship, and now asserts it owns and must protect due to its purported value and secrecy. (Response at pp. 2-3, 9-10.) However, under Section 6(e) of the Agreement, Canvas is the exclusive owner of the intellectual property created during the term of

the Agreement (including marks, goodwill and derivative works) ***and*** "other confidential and proprietary information developed ***by or for [Canvas].***"  (ECF No. 17, PageID.86-87) (emphasis added). So, no matter which party created it, or exchanged it with the other during the distribution partnership, if the confidential assets and information were created *by or for Canvas* to further sales in Chicago, then Canvas is the "exclusive owner" of the intellectual property, as well as all "confidential and proprietary information" created pursuant to the Agreement.

The Agreement tasks Canvas with, among other responsibilities, (a) developing and implementing brand strategies for the products with assistance from Glunz, (b) developing the marketing strategies and programs, pricing information, sales materials, and (c) developing the sales, merchandising, and promotional materials to give to Glunz to promote the sales of the products.  (See ECF No. 17, PageID.87.) Section 6(e) establishes ownership of the resulting information with Canvas.  (ECF No. 17, PageID.86-87.)  Canvas owns the information because the Agreement says it created it, but also because the Agreement says it owns it. *Id.*  Glunz is just one of many distributors working with Canvas.  Distributors do not typically get to claim ownership of information to prevent suppliers from using it in the future, particularly when not in competition with the distributor.

Even if the Complaint had properly identified the alleged confidential information or trade secrets, the record is clear that the information was created, exchanged, and used under the Agreement for Canvas's benefit in Chicago and belongs to Canvas. Glunz cannot invoke trade secret law to prevent the owner from using its own information  of its business into the future.

> B.  <u>Glunz Misinterprets or Misapplies the Confidentiality Clause to Claim Ownership Over Information It Does Not Have.</u>

Section 8(d) of the Agreement requires each party to protect the other's "Confidential Information," yet Glunz's Response conflates the mutual confidentiality obligations with

ownership of confidential information, or protection of purported "trade secrets" it has compiled because of the services it performed under the Agreement. (ECF No. 17, PageID.88.) Glunz asserts "Canvas was using Glunz's trade-secret and confidential information to preemptively facilitate a transition" and "accessed and used Glunz's confidential information beyond the scope". (Complaint ¶¶ 25, 29; Response at p. 5.) However, the confidentiality clause is bilateral; both parties have agreed to the protections in the Agreement, regardless of who created the information. *Id.* The parties each agreed to protect confidential information with at least the same degree of care as they would their own confidential information. *Id.* No matter who created the information or stored it on their servers, confidentiality was required and should be enforced. But where the information was created by, or for, Canvas, under the Agreement, Glunz's attempt to prevent Canvas from ever using the information in the future is meritless. Where the information used by the parties was Canvas's information, whether it was created by or for Canvas, Glunz's attempt to restrict Canvas's use of that information indefinitely is unsupported by facts or law. (See ECF No. 17, PageID.86-87.)

**VI.    The Parties Negotiated Termination and Compensation Provisions Establishing the Parties' Rights Once the Agreement Ended**

Glunz negotiated and agreed to the terms of the Agreement, including when and how it could be terminated, and the compensation it would receive if and when the relationship was completed. Glunz cannot now complain of the very circumstances the parties anticipated to evade the terms they negotiated. Glunz's Response confirms that one of its major objectives is to prevent Canvas from participating in the Chicago market if it no longer wishes to use Glunz as its distributor in that area. That desire is contrary to the clear terms of the Agreement, which permit termination of the relationship and the selection of a new distributor following termination, with

payment based upon pre-agreed terms. Traditional notions of fair commercial play and free competition are upended if Glunz's argument prevails.

Either party was permitted to terminate the Agreement with proper notice. (ECF No. 17, PageID.86.) The parties negotiated and planned for a payment to be made if/when Canvas terminated the Agreement without cause. The Responses' argument betrays common sense by suggesting that Canvas would not be able to use its own data that it helped develop, owns, and has had access to for years. It cannot "forget" its own information, and it is unreasonable to argue it cannot share it with its own distributors in the future. The Agreement compensates Glunz during the term of the Agreement and after its termination. Canvas should not face liability for trade secret misappropriation, whether occurring in the past, currently, or in the future.

### Conclusion

Glunz's Response suffers from the same deficiencies as its Complaint. It lacks the requisite specificity to identify any protectable trade secret or to plausibly allege misappropriation. While Glunz may be dissatisfied with the Agreement it negotiated, it cannot convert a breach of contract dispute into a trade secret claim—or transform ordinary business information into trade secrets— particularly where the Agreement makes clear that the information belongs to Canvas, provides for a termination payment, and contemplates post-termination use. Accordingly, Glunz's Second and Third Causes of Action should be dismissed along with the Fourth Cause of Action by Glunz's agreement.

Respectfully submitted,
CANVAS 340, LLC


By:  /s/ Barry P. Kaltenbach
        One of Its Attorneys

Joseph M. Infante (ARDC 6329000)
infante@millercanfield.com
Barry P. Kaltenbach (ARDC 6270034)
kaltenbach@millercanfield.com
Miller, Canfield, Paddock & Stone, PLC
227 W. Monroe, Suite 3600
Chicago, Illinois 60606
(312) 460-4200
(local counsel)

Shauna Barnes
(sbarnes@drinkslaw.com)
Barnes Beverage Group
1910 Town Center Blvd. #250
Annapolis, Maryland 21401
(*admitted pro hac vice*)